UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ALTMAN GROUP, INC.,<br>    7021 Kewanee Ave.<br>    Suite 1-101<br>    Lubbock, Tx 79424,<br><br>              Plaintiff,<br><br>        v.<br><br>FEDERAL CROP INSURANCE CORPORATION,<br>    USDA/RMA/Stop 0801<br>    Room 2004-South<br>    1400 Independence Ave.<br>    Washington, DC 20250,<br><br>    and,<br><br>Producers Agriculture Insurance Company,<br>    5601 Interstate 40 West, Suite 204<br>    Amarillo, TX 79106,<br><br>          Defendants. | Civil Action No.: 25-2193<br><br>COMPLAINT FOR<br>DECLARATORY JUDGMENT |

**INTRODUCTION**

1.      Pursuant to 28 U.S.C. § 2201, The Altman Group, Inc., (hereinafter "Altman")

brings this action for Declaratory Judgment against the Federal Crop Insurance Corporation

(hereinafter "FCIC") and Producers Agriculture Insurance Company (hereinafter "ProAg).

2.      FCIC has the authority under the Federal Crop Insurance Act (hereinafter "the

Act") (7 U.S.C. §§ 1501-1524) to operate and regulate the Federal crop insurance program.

3.      The Risk Management Agency (hereinafter "RMA"), which was created in

section 226A of the Federal Agriculture Improvement and Reform Act of 1996, administers the

1

crop insurance programs on behalf FCIC since FCIC has no employees except those expressly mandated in the Act so the terms RMA and FCIC may be used herein interchangeably.

4.    The Federal crop insurance program is delivered on behalf of FCIC by approved insurance providers (hereinafter "AIPs"), including ProAg, through a Standard Reinsurance Agreement (hereinafter "SRA").   AIPs are compensated through the payment of an administrative and operating subsidy (hereinafter "A&O") in accordance with section 508(k) of the Act (7 U.S.C. § 1508(k)).

5.    In exchange for reinsurance and A&O, AIPs agree they will comply with the Act, FCIC's regulations, the SRA, and all FCIC policy and procedures.

6.    There are no issues of fact in this case.  The Crop Insurance Agency Agreement between Altman and ProAg, signed on June 21, 2017; the Multiple Peril Commission Schedule signed by Altman on December 9, 2021; and the "MPCI Commission Schedule Amendment; Livestock Price Insurance Commission Schedule and Crop-Hail & Named Peril Commission Schedule The Altman Group, Inc.," signed by ProAg on November 16, 2023, all speak for themselves.  The Act, the SRA, Crop Insurance Handbook, bulletins and memoranda, FCIC approved policy and procedure, and all communications referenced herein all speak for themselves.

7.    Since 2017, ProAg entered into a Crop Insurance Agency Agreement with a crop insurance agency, Altman, to perform all the duties necessary to sell and service crop insurance policies underwritten by ProAg in the State of Texas under the SRA.

8.    The FCIA determines the manner in which AIPs and crop insurance agents are compensated under the Federal crop insurance program under sections 507(c)(3), 508(d), 508(k),

516(a)(2)(A) and 516(b)(1)(B), of the Act (7 U.S.C. §§ 1507(c)(3), 1508(d), 1508(k), 1516(a)(2)(A) and 1516(b)(1)(B)).

9.    Altman seeks a declaration that under the FCIA and SRA, at all times, FCIC has a duty to ensure that agents are paid in compliance with the requirements of section 507(c)(3) of the FCIA.

10.    Altman seeks a declaration that FCIC has failed in its duty to ensure that ProAg's Multiple Peril Commission Schedules, effective for the 2022 through current crop year, complied with the requirements of section 507(c)(3) of the FCIA from the 2022 to the current crop year.

11.    Altman seeks a declaration that FCIC failed in its duty to require that ProAg take such actions as are necessary to ensure that Multiple Peril Commission Schedules complied with the requirements of section 507(c)(3) of the FCIA from the 2022 to the current crop year after FCIC was made aware of the actions of ProAg that comprised the violations.

12.    Altman seeks a declaration that the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year is invalid because it modifies the Crop Insurance Agency Agreement with ProAg dated June 21, 2017, without the mutual written consent of both parties, as required by the Crop Insurance Agency Agreement.

13.    Altman seeks a declaration that the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year, that provides for compensation in the amount of 5 percent of the applicable A&O subsidy when other agents doing performing the same duties and tasks are paid 80 percent of the A&O subsidy, and agents perform a vast majority of the work for the functions in the sale,

3

renewals and the continuing services while the policy is in effect, does not comply with the agent compensation provisions contained in section 507(c)(3) of the Act.

14.    Altman seeks a declaration that the Multiple Peril Commission Schedule, dated December 9, 2021 and used to compensate Altman for the 2022 and 2023 crop years, which reduces the 80 percent of the A&O subsidy commission, paid to all other agents performing the same duties and tasks, by 50 percent based on loss ratio does not comply with the agent compensation provisions contained in section 507(c)(3) of the Act.

15.    Altman seeks a declaration that, under section 507(c)(3) of the Act, all agents selling a plan of insurance must be paid the same commission as all other agents selling that same plan of insurance since all agents are performing the same duties and tasks in the sale, renewal, and continues service of the policy while it is in effect.

16.    Altman seeks a declaration that the 80 percent of the A&O subsidy commission contained in ProAg's Multiple Peril Commission Schedule, dated December 9, 2021, paid to all other agents performing the same duties and tasks as Altman, is in effect for all of the 2022 through current crop years and must be used to compensate Altman for all policies it writes for ProAg for the 2022 through the current crop year.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction under 28 U.S.C. §§ 2201 and 1331 and 7 U.S.C. § 1506(d).

18.    FCIC's principle place of business is in the District of Columbia under section 503 of the Act (7 U.S.C. § 1503).

19.     ProAg has executed a Standard Reinsurance Agreement with FCIC, so it is doing business with a District of Columbia entity and, therefore, subject to the personal jurisdiction of the District Court for the District of Columbia.

20.     The substantial part of the events or omissions giving rise to the dispute were committed in the District of Columbia.

21.     Venue is proper under 28 U.S.C. §§ 1391(c) and (e) and 7 U.S.C. 1506(d).

**PARTIES**

22.     Altman is a crop insurance agency that has been selling crop insurance for over 40 years under the Federal crop insurance program.

23.     Altman was one of the first agencies to get involved in the Federal crop insurance program when Congress authorized the sale of crop insurance policies through private entities.

24.     Altman primarily writes business in West Texas and has been contracted with ProAg since 2017 to sell and service its crop policies, with premium volumes in the millions of dollars.  Altman contracts with subagents who write under the Altman name and are compensated by Altman.

25.     FCIC is an agency within the United States Department of Agriculture that was formed in 1938.  Originally FCIC sold policies directly to farmers but in the early 1980's, Congress authorized the sale of crop insurance policies through private insurance companies. Initially, private insurance companies only sold and services policies for a fee but did not retain premium or any of the risks associated with crop losses.

26.     By mid-1980's, FCIC had entered into an SRA with the private insurance companies, now known as AIPs, who now retained a portion of the premium and a portion of the losses.  FCIC also paid the AIPs an A&O subsidy to cover their costs to deliver the program.

5

27. The current SRA was first effective for the 2011 reinsurance year and remains in effect today.

28. Upon information and belief, ProAg is a private insurance company that was reinsured by FCIC under an SRA since the 1990's.

29. ProAg was purchased by Japan's Tokio Marine HCC in 2015. ProAg has headquarters in Amarillo, Texas and sells policies nationwide.

**STATEMENT OF FACTS**

**A.    In General.**

30. FCIC is a regulator of the Federal crop insurance program.

31. Section 502(a) of the Act (7 U.S.C. § 1502)) states: "It is the purpose of this subtitle to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance."

32. Section 507(c)(2) of the Act (7 U.S.C. § 1507(c)(2)) states that FCIC should contract with private insurance companies, private rating bureaus, and other organizations as appropriate to enable the FCIC to concentrate on regulating the provision of insurance under the Act.

33. Section 506 of the Act (7 U.S.C. § 1506) contains numerous authorities for FCIC in its conduct of the Federal crop insurance program, including section 506(e), which states "The Corporation may adopt, amend, and repeal bylaws, rules, and regulations governing the manner in which its business may be conducted and the powers granted to it by law may be exercised and enjoyed" and section 506(k), which states "The Corporation shall have such powers as may

6

be necessary or appropriate for the exercise of the powers herein specifically conferred upon the Corporation and all such incidental powers as are customary in corporations generally."

34. Section 506(l) of the Act states "The Corporation may enter into and carry out contracts or agreements, and issue regulations, necessary in the conduct of its business, as determined by the Board."

35. FCIC regulates all aspects of the Federal crop insurance program, including, but not limited to, writing or approving all terms and conditions of the policies sold to farmers, setting the premium rates, publishing the procedures that all AIPs and agents must follow in the sale and service of policies, publishing the procedures used by all AIPs and loss adjusters in the adjustment of losses, conducting audits and reviews to ensure that farmers, agents, loss adjusters and AIPs follow all FCIC approved policy and procedure.

36. Congress enacted section 515 of the Act (7 U.S.C. § 1515) to "to improve compliance with, and the integrity of, the Federal crop insurance program."

37. Section 515(a)(2) of the Act states "The Corporation shall work actively with approved insurance providers to address program compliance and integrity issues as such issues develop."

38. Under section 515(f) of the Act, FCIC reviews the conduct of agents and loss adjusters to detect anomalous claims and "take appropriate remedial action with respect to any occurrence of fraud, waste, or abuse identified in a review conducted under this paragraph."

39. Section 515(h) of the Act contains sanctions for failure to follow FCIC approved policy and procedures.

40. Section IV(h)(1) of the SRA states: "The Company and its affiliates shall comply with the provisions of this Agreement, as applicable. The Company is solely responsible for the

7

conduct and performance of its personnel and affiliates with respect to the obligations imposed by this Agreement and FCIC procedures." The "Company" referred to is the AIP.

41. Section IV(h)(4) of the SRA states: "In addition to any other remedies available under this Agreement, if FCIC finds that the Company has not complied with a provision of this Agreement, and the Company has not taken appropriate steps to correct the act of non-compliance, FCIC may, at its sole discretion, require that the Company take corrective action within 45 days of the date of making a written demand. The Company shall provide FCIC with satisfactory documentary evidence of the corrective action taken to address the act of non-compliance."

42. Section IV(h)(6) of the SRA states: "In addition to any other remedies in this Agreement, if FCIC determines that the Company or its affiliate willfully violated the Agreement or FCIC procedures, FCIC reserves the right to deny reinsurance, A&O subsidy, CAT LAE, and risk subsidy for any insurance contract that is sold or serviced in violation of the terms of this Agreement or FCIC procedures."

43. FCIC is also a reinsurer of the AIPs through the SRA in that it receives a portion of the premium in exchange for assuming a portion of the losses.

44. In the preamble, the SRA states that it "establishes the terms and conditions under which the Federal Crop Insurance Corporation (FCIC), supervised by the Risk Management Agency (RMA) as authorized in section 226A of the Federal Agriculture Improvement and Reform Act of 1996, will provide subsidy and reinsurance on eligible crop insurance contracts sold by the Company. This Agreement is authorized by the Federal Crop Insurance Act (Act) and regulations of FCIC published at 7 C.F.R. chapter IV (regulations)."

45.     The preamble to the SRA states that it "is a cooperative financial assistance agreement between FCIC and the AIPs to deliver eligible crop insurance contracts under the authority of the Act."

46.     Under section I of the SRA, the Agreement/SRA means "this Standard Reinsurance Agreement, including Appendices, the Act, and regulations, in effect as of the July 1 start of the reinsurance year, unless otherwise provided for in the Agreement."

47.     The definition of "Agreement" also states that "if there is a conflict between a provision of the Act, the regulations, or FCIC procedures with the terms of the SRA, the order of precedence will be: (1) the provisions of the Act; (2) the regulations; (3) this Agreement; and (4) FCIC procedures, with (1) controlling (2) and (2) controlling (3), etc."

48.     The SRA states in section II that "For the Company [AIP] to receive reinsurance, A&O subsidy, CAT LAE, and risk subsidy under this Agreement, an insurance contract must qualify as an eligible crop insurance contract, except as otherwise specified in this Agreement."

49.     The SRA defines "eligible crop insurance contract" as "an insurance contract with an eligible producer: (1) covering an agricultural commodity authorized to be insured under the Act and approved for sale by FCIC; (2) with terms and conditions in effect as of the applicable contract change date; (3) that is sold and serviced in accordance with the Act, FCIC regulations, FCIC procedures, and this Agreement; and (4) that has a sales closing date within the reinsurance year."

50.     The SRA also states in section II that "Except as specified below, the Company shall offer and market all plans of insurance for all crops in any State where actuarial documents are available in which it writes an eligible crop insurance contract and shall accept and approve

9

applications from all eligible producers. The Company may not cancel an eligible crop insurance contract held by a policyholder so long as the policyholder remains an eligible producer and the Company continues to write eligible crop insurance contracts within the State, except as authorized by FCIC."

51.     Section 508(b)(7) of the Act states "The Corporation may limit catastrophic risk coverage in any county or area, or on any farm, on the basis of the insurance risk concerned."

52.     Section 508(c)(9) of the Act states "The Board may limit the availability of additional coverage under this subsection in any county or area, or on any farm, on the basis of the insurance risk involved."

53.     FCIC's regulations published at 7 C.F.R. § 457.8(b) states "FCIC or the reinsured company may reject or discontinue the acceptance of applications in any county or of any individual application upon FCIC's determination that the insurance risk is excessive."

54.     Section II of the SRA contains the provisions of reinsurance, including provisions regarding underwriting gains and underwriting losses.

55.     In addition to reinsurance for eligible crop insurance contracts, FCIC pays A&O to AIPs to compensate them for the expenses to sell, service, and adjust the crop insurance policies.

56.     In accordance with sections 508(k), 516(a)(2)(B) and 516(b)(1)(C) of the Act, FCIC provides compensation to AIPs as A&O subsidy, which is a percentage of the premium for the policy.

57.     Section III of the SRA contains the provisions relating to the A&O paid to the AIP and the amount of compensation paid to agents.

10

58.    Section III(a)(2) of the SRA contains the provisions regarding the payment of A&O to the AIPs and states "Notwithstanding the provisions of this section, under no circumstances will A&O subsidy or CAT LAE be paid in excess of the amounts authorized by the Act."

59.    With a few exceptions, such as area plans of insurance, AIPs are paid A&O in the amount of 18.5 percent or 21.9 percent of the premium depending on the policy and plan of insurance.

60.    Section III(a)(2)(I) of the SRA also states "Notwithstanding subparagraphs (E) through (H), FCIC will pay additional A&O subsidy for eligible crop insurance contracts in States in which the loss ratio is greater than 120 percent of the total net book premium written in the State by all AIPs as follows:

(i) FCIC will pay an additional A&O subsidy amount equal to 1.15 percent times the net book premium for eligible crop insurance contracts subject to subparagraphs (E) and (F) and calculated according to subparagraphs (E) and (F)".

61.    The Act and the SRA also contain provisions relating to the compensation of agents.

62.    In accordance with sections 507(c)(3), 516(a)(2)(A) and 516(b)(1)(B) of the Act, agent commissions are paid from the amount of A&O subsidy an AIP receives for the policy.

63.    Section 507(c)(3) of the Act states in relevant part: "the Board shall, to the maximum extent possible, . . . (3) encourage the sale of Federal crop insurance through licensed private insurance agents and brokers and give the insured the right to renew such insurance for

successive terms through such agents and brokers, in which case the agent or broker shall be reasonably compensated from premiums paid by the insured for such sales and renewals recognizing the function of the agent or broker to provide continuing services while the insurance is in effect".

64.     Section 516(a) of the Act states: "there are authorized to be appropriated such sums as are necessary to cover for each of the 1999 and subsequent reinsurance years the following:

.   .   .   .

(A) The administrative and operating expenses of the Corporation for the sales commissions of agents."

65.     Section 516(b) of the Act states: "For each of the 1999 and subsequent reinsurance years, the Corporation may pay from the insurance fund established under subsection (c) all expenses of the Corporation (other than expenses covered by subsection (a)(1) and expenses covered by paragraph (2)(A)), including the following:

.   .   .   .

(B) Administrative and operating expenses of the Corporation necessary to pay the sales commissions of agents."

66.     Section III(a)(4) of the SRA contains provisions regarding the payment of compensation to agents.

67.     Section III(a)(4)(B) states: "Except as provided in subparagraph (C), in any State in which the Company is doing business, the Company, its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE calculated in accordance with subsection (a)(2) excluding any amounts paid under subsection

(a)(2)(I), for such State. The calculation of the 80 percent is based on the amount paid by FCIC on the first annual settlement report for the reinsurance year."

68.    Section III(a)(4)(C) allows for additional payments to agents in a state if the AIP has an underwriting gain in that state.

69.    Section III(a)(4)(C)(ii) states "For any State in which the Company is doing business, the total amount of all compensation paid under this subparagraph and subparagraph (B) does not exceed 100 percent of the total amount calculated for A&O subsidy and CAT LAE in accordance with subsection (a)(2), excluding any amounts paid under subsection (a)(2)(I), for such State."

70.    Section III(f) of Appendix II to the SRA states "The Company shall provide Agent Compensation Reports, itemizing agent commissions and other agent compensation for eligible crop insurance contracts reinsured by FCIC as specified in the Agent Compensation Template and completed for the: (1) Previous reinsurance year's actual data certified by a financial officer, authorized by the Company, as being in compliance with FCIC procedures; (2) Current reinsurance year's estimated data; and (3) Upcoming reinsurance year's projected data."

**B.    The Underlying Actions.**

71.    Altman signed a Crop Insurance Agency Agreement with ProAg on June 21, 2017 to sell and service ProAg's policies.

72.    This ProAg/Altman Crop Insurance Agency Agreement currently remains in effect currently.

73.    Article IV of the ProAg/Altman Crop Insurance Agency Agreement states: "The Company shall compensate the Agent as specified in the Agent Commission Addendum, Crop Hail and Named Peril Commission Addendum, and/or other applicable addendum executed by the Company and Agent for all Policies which result in fully and timely collected premiums. Amounts payable to Agent are subject to deductions noted in this Agreement. This compensation shall be payment in full for all services rendered by the Agent on behalf of the Company. The Company shall not be responsible for any commission or compensation that may be owing to a Subagent or employee of the Agent. Commission amounts are determined by the commission percentage and policy type as shown on the Agent Commission Addendum or other applicable addendum executed by the Company and Agent. All premiums received by the Company shall first be credited to interest, if applicable, then to premium for the purpose of commission. No commission shall be accrued or paid to the Agent with respect to MPCI policies for any premium which remains unpaid after the termination date published by FCIC or as otherwise specified in the Agent Commission Addendum, or other applicable addendum executed by the Company and Agent, whether or not said premium is subsequently paid or collected. Commission will be reduced for any damages or deductions that FCIC charges the Company as a result of the Agent's late filing of insurance documents. Agent acknowledges and agrees that compensation paid by the Company to Agent for the direct sale and service of MPCI, whether under this Agreement or with respect to any other amount or item qualifying as "compensation" under the SRA, is subject to limitations and caps under the terms of the SRA and applicable guidelines or mandates published by FCIC. The Agent agrees that in the event that the compensation paid or owing by the Company pursuant to this Agreement, or otherwise causes, in whole or in part, the Company

14

to exceed the applicable limitations imposed by the SRA and/or FCIC, the Company may reduce the Agent's compensation proportionally so as not to exceed applicable limits.

Any Agent Commission Addendum, commission schedule, or other addendum executed by the Agent and Company is subject to the terms of this Agreement, unless specifically noted in writing signed by both parties."

74.    Article V.M. of the ProAg/Altman Crop Insurance Agency Agreement states: "1) This Agreement is subject to the Federal Crop Insurance Act, as amended, the regulations promulgated thereunder, and the Standard Reinsurance Agreement ("SRA"), which is incorporated herein by reference and which is in the possession of the Company, and any and all procedures, manuals, guidelines, and policies issued or approved by FCIC or the Risk Management Agency ("RMA"). To the extent that terms and conditions of this contract are inconsistent with federal law, regulations, procedures, or the SRA, now or as they may be amended, the latter shall control."

75.    Article IX.B. of the ProAg/Altman Crop Insurance Agency Agreement states: "This Agreement or any provision herein may be amended, modified, or waived only in writing signed by the Company and the Agent."

76.    ProAg issued a "Multiple Peril Crop Insurance Commission Schedule" dated December 9, 2021, effective for the 2022 crop year that contained a table with a commission of 80 percent for all policies and plans of insurance, with exceptions to the table noted below.

77.    One exception to the table stated: "Commission for all Texas Crops (all commodities in the RMA Actuarials for Texas other than Annual Forage, PRF, and perennials) will be 50% of the rate in the first column. If the final Agency Loss Ratio for Texas Crops is less

15

than or equal to 90%, base commission, adjusted by the RMA A&O Ceiling Factor, up to the rate in the last column will be payable."

78.    This exception to the table reduced the commission rate of 80 percent by 50 percent for Texas agents, effectively paying a commission rate of 40 percent of the A&O subsidy unless the loss ratio for the Texas agent was less than or equal to 90 percent.

79.    When Altman signed the "Multiple Peril Crop Insurance Commission Schedule" dated December 9, 2021, it was unaware of the provisions in section 507(c)(3) of the Act. Altman did not become aware of section 507(c)(3) of the Act or that the commission schedule was not in conformance with this provision or the SRA until July of 2024.

80.    Altman policies had a loss ratio in excess of 90 percent so Altman's commissions were reduced to 40 percent of the A&O for the 2022 and 2023 crop years.

81.    There were a number of other exceptions to 80 percent commission rate in the table for other states and crops that significantly reduced the commissions for agents for other crops, states, or plans of insurance.

82.    This "Multiple Peril Crop Insurance Commission Schedule" signed by Altman on December 9, 2021, was in effect for the 2022 and 2023 crop years.

83.    In April 2022, ProAg marketing representatives came into Altman's office to discuss commission for 2023.  At this time, they had a list of all Altman's policyholders and what the loss ratio was for each policyholder.

84.    The representative went through the list policyholder by policyholder and advised Altman which policies had a high loss ratio that they preferred Altman move to another AIP.

85. At this same time, they also discussed the possibility of these bad loss ratios causing Altman to lose its contract with ProAg.

86. The representative told Altman moving Altman's annual forage business to another AIP would be a show of good faith on the agency's part indicating that Altman was trying to help the agency develop better loss ratios.

87. As a result of the threats, Altman moved those policies to the best of their ability.

88. For the 2024 and succeeding crop years, ProAg provided Altman with a new commission schedule entitled "MPCI Commission Schedule Amendment; Livestock Price Insurance Commission Schedule and Crop-Hail & Named Peril Commission Schedule The Altman Group, Inc." that was only signed by ProAg on November 16, 2023. There was no signature line for Altman.

89. Prior to 2024, all Multiple Peril Commission Schedule were negotiated between ProAg and Altman and signed by Altman when agreement was reached.

90. This November 16, 2023, Commission Schedule stated: "The Commission Rates and Exceptions described on page 1 of the MPCI Schedule are deleted and replaced in whole with the following:

**Commission Rates:** For all new and renewal policies under any insurance plan subject to the Standard Reinsurance Agreement ("SRA") sold and serviced by the Agency for the Company for the 2024 Reinsurance Year ("RY") or subsequent RY's, and for which premiums are timely collected and A&O Subsidy or CAT LAE is received by the Company, the Company will pay Agency 5.0% of the applicable A&O Subsidy or CAT LAE, after application of any applicable SRA A&O Ceiling Factor.

17

The commission described above, as may otherwise be reduced under the terms of the Agency Agreement and MPCI Schedule, shall constitute full and complete compensation for the sale and service of any such affected policies.

All provisions of the Agency Agreement and MPCI Schedule not specifically amended above shall remain in full force and effect.

**LIVESTOCK PRICE INSURANCE COMMISSION SCHEDULE**

The following base commission rates will be paid on all collected premiums for eligible livestock price insurance contracts ("ELPICs") federally reinsured pursuant to the Livestock Price Reinsurance Agreement ("LPRA") entered into between the FCIC and Producers Agriculture Insurance Company (together with those affiliates set forth in the Agency Agreement, the "Company") that are sold and serviced by Agency in accordance with the Agency Agreement, LPRA, and FCIC procedure in the 2024 Reinsurance Year ("RY") and subsequent RY's:

**Existing Policies.** For endorsements on existing 2024 RY ELPICs as of the date of the signature below:

Base Commission*

LRP-16%

**New Policies.** For any endorsements under a new ELPIC sold after the date of the signature below or for any endorsements on any policies renewed or sold in a subsequent RY:

Base Commission*

LRP ·- 4%

DRP- 2%".

91.     In addition to the issue of mass cancellations, around July 2023, there were allegations that AIPs were not accepting any new business, were cancelling agent contracts, and were slashing agent commission so low to get agents to move their books of business.

92.     On July 11, 2023, agents raised the issues of AIPs refusing to take the agent's business and cutting agent commissions with FCIC, who responded "Thank you Mr. Jolly. We are well aware of this issue/concern and I have been in discussion with our Administrator's office to determine what can be done.  I will provide this e-mail as further concerns and hopefully we can do something to resolve this issue."

93.     On August 30, 2023, ProAg notified agents that letters were being sent to insureds cancelling their policies for the fall 2024 sales closing date.

94.     On August 31, 2023, the undersigned counsel, on behalf of Altman, contacted RMA to notify them of the issues and FCIC stated they were aware of the mass cancellations and they will try to expedite a cease and desist order to the AIPs.

95.     On August 31, 2023, the undersigned counsel also spoke to a staffer on the Senate Agriculture Committee.  She had not heard of the issue and planned to speak with other staffers about potential solutions.

96.     In October 2023, Altman contacted FCIC to discuss the issue of crop insurance for spring 2024 because AIPs were telling agents to move their book of business to other AIPs because they had losses.

97.    On October 10, 2023, FCIC responded stating "Thank you for reaching out and providing this information.  I have shared it with the RMA leadership team, and we all share your concerns with the difficult challenges Texas growers are facing.  Our primary focus is always to ensure that producers have the coverage they need to help them through difficult years.  When AIP actions jeopardize coverage, RMA addresses the violations on a case-by-case basis with individual AIPs.  In this situation we have issued Cease & Desist letters.  We are also addressing broader concerns with _all_ AIPs.

We are currently looking at potential policy and procedural changes, that align with the SRA, to avoid situations in the future like the ones you have outlined.  We are also working closely with Congress and look forward to a new Farm Bill and the strength it can add to the crop insurance program.

Thank you for your ongoing support of the federal crop insurance program."

98.    On October 18, 2023, RMA issued Product Management Bulletin: PM-23-064, which states: "The Federal Crop Insurance Corporation (FCIC) amended the Common Crop Insurance Policy (CCIP) Basic Provisions and Area Risk Protection Insurance (ARPI) Basic Provisions. The changes apply for the 2024 and succeeding crop years for the November 30, 2023, contract change date and for the 2025 crop year for crops with a contract change date prior to November 30, 2023.

The changes in the CCIP and ARPI Basic Provisions clarify that an approved insurance provider (AIP) may only cancel a policy with express written consent from FCIC in the CCIP and ARPI Basic Provisions. This change is consistent with the Standard Reinsurance Agreement which prohibits any AIP from cancelling an eligible crop insurance policy held by a producer so

20

long as the producer remains eligible and the AIP continues to write eligible crop insurance contracts within the State, except as authorized by FCIC.

A Final Rule with these changes was published in the Federal Register on October 18, 2023. FCIC invites you to submit comments on this rule through the close of business on December 13, 2023, at regulations.gov."

99.    This bulletin and policy changes do not address the issue of the reductions in agent commissions raised in the July 2023 communications with FCIC.

100.    On March 15, 2024, RMA issued "Manager's Bulletin MGR-24-003: Notice to Cease and Desist Agent/Agency Contract Terminations."  In the Background section, RMA stated: "The Risk Management Agency (RMA) is aware that some Approved Insurance Providers (AIPs) are decreasing their federal crop insurance business in specific crops, plans of insurance, and geographic areas. Actions taken to transfer the business to another AIP include terminating the agent/agency contract and decreasing their compensation. Termination notifications have included language that no new business would be accepted for the current reinsurance year, policies would be cancelled if not transferred, and have been sent with insufficient time for the agent/agency to take action before the policy sales closing date. This has led to marketplace confusion, disruption, and miscommunication, requiring RMA action to ensure farmers and ranchers are not deprived of coverage, have their policies properly administered, and continue to have confidence in and access to this vital program."

101.    In MGR-24-003, RMA stated in the Action section that "All AIPs shall cease and desist any cancellation of agent contracts until RMA can review the information requested below pursuant to the 2024 SRA and LPRA Appendix II Section IV(o). In accordance with Section

21

IV(h)(9) of the SRA and LPRA, failure to cease and desist any activity or take a specific action, as required by the Federal Crop Insurance Corporation in writing, will subject the Company or its affiliates to the sanctions in section 515(h) of the Act (7 U.S.C§1515(h)).

Under 2024 SRA and LPRA Appendix II Section IV(o), RMA requests the following information by April 1, 2024:

1) A list of agent/agencies whose contract was terminated for the 2024 reinsurance year, including location.

2) A list of agent/agencies whose compensation was decreased for the 2024 reinsurance year, including location and revised compensation terms.

To increase transparency and protect continuity of coverage for producers, new reporting requirements regarding intended business decreases, agent/agency contract termination, and agent/agency compensation reductions have been added to the 2025 SRA and LPRA Appendix II as a new Section IV(p) and include the following:

1) A summary of your intensions to decrease business for the 2025 reinsurance year, including location, crop, and plan of insurance.

2) A list of agent/agencies whose contract has been or will be terminated for the 2025 reinsurance year, including location.

3) A list of agent/agencies whose compensation has been or will be decreased for the 2025 reinsurance year, including location and revised compensation terms.

Further, AIPs shall certify that any future agent cancellation notifications will provide the affected agent/agency 60 days written notice, or the period of notice required by state law

whichever is longer, prior to the first sales closing date of the agent/agencies book of business. AIPs shall provide RMA written notice 30 days prior to sending the agent/agency written notice."

102.    In MGR-24-003, RMA expressly asked for a list of agents whose compensation was or will be decreased, acknowledging that they knew AIPs were reducing agent compensation.

103.    On June 3, 2024, RMA issued Manager's Bulletin-MGR–24-003.1: Amended - Notice to Cease and Desist Agent/Agency Contract Terminations, which lifting the cease-and-desist action required in MGR-24-003.

104.    In MGR-24-003.1, RMA stated: "RMA has reviewed the additional documentation submitted by the AIPs. In addition, RMA has received assurances from the AIPs that they will continue to accept new, transferred, and existing business so that no eligible producer will lose or be denied coverage. RMA will continue to monitor the situation and evaluate the information provided by the AIPs in Appendix II, Section IV(p) of the Standard Reinsurance Agreement and Livestock Price Reinsurance Agreement."

105.    On June 21, 2024, RMA issued Manager's Bulletin-MGR–24-003.2: Amended - Notice to Cease and Desist Agent/Agency Contract Terminations stating "RMA is lifting the notification/certification requirement in MGR-24-003 and the 2025 SRA and LPRA Appendix II, Section II(i). Informational requirements under Appendix II, Section IV(p) remain in place. RMA continues to monitor policyholder coverage and address issues with individual AIPs, as warranted."

106. As justification for its lifting the notification/certification requirement RMA stated: "MGR-24-003 also required AIPs certify that any future agent cancellation notifications will provide the affected agent/agency 60 days written notice, or the period of notice required by state law whichever is longer, prior to the first sales closing date of the agent/agencies book of business and provide RMA written notice 30 days prior to sending the agent/agency written notice. This requirement was established in the 2025 Standard Reinsurance Agreement (SRA) and Livestock Price Reinsurance Agreement (LPRA) Appendix II, Section II(i). Considering the additional information already being provided by AIPs under the new Section IV(p) in Appendix II, RMA has determined certification is no longer necessary to RMA's continued monitoring of agent/agency contract terminations and the potential adverse impact on producers' ability to obtain and retain crop insurance coverage."

107. On July 23, 2024, the undersigned counsel, on behalf of Altman, contacted FCIC by email, stating: "Hi Heather,

I wanted to give you heads up. I was contacted by several agents in Texas again last week about policy cancellations and agent commissions. I thought the issue had been resolved by the cease and desist bulletin MGR-24-003 back in March. However, they told me that RMA had rescinded the cease and desist because the AIPs promised to write and maintain all their policies. Unfortunately, the AIPs have not honored that pledge and are treating the agents worse than ever and it is having a severe impact on producers. AIPs are constructively cancelling policies by reducing agents' commissions to such low levels that agents can no longer stay in business. See attached.

The agents feel they have nothing to lose. At current commission levels, they may be out of business in a matter of months, leaving producers unprotected. I convinced them to let me

24

talk to you before they do anything drastic.  Is there a time we can talk in the next few days?  This is incredibly time sensitive because 2025 policies are already being written in Texas and agents have yet to receive a commission schedule for 2025 and they fear it will only get worse.  I am free the rest of today, tomorrow and Friday and any time next Monday or Tuesday.  Please contact me at your earliest convenience."

108.    On July 24, 2024, the undersigned counsel spoke to Heather Manzano, Deputy Administrator for RMA, regarding Altman's problems with ProAg drastically cutting commissions to 5 percent and that ProAg was cherry picking policies to be moved to other AIPs and she stated that RMA's concern is with the farmers, not the agents, and farmers have not been complaining of any disruptions in service.

109.    On July 24, 2024, the undersigned counsel, on behalf of Altman, again contacted RMA stating: "An additional thought.  See section III(2)(J) of the SRA states:

"In addition to other provisions of this Agreement, the amount of A&O subsidy may be adjusted to a level that FCIC determines to be equitable if issuing or servicing eligible crop insurance contracts involves expenses that vary significantly from the basis used to determine the A&O subsidy under this section."

I would think reducing agent commissions by as much as 95 percent would qualify for an adjustment under this provision.  Even those that have been reduced by 0-50 percent or more would qualify.  I would think that the threat to reduce A&O commensurate with the commission reduction may change the AIP behavior and that is well within your legal authority.  Luckily for you, you already have the documentation for the effected agents."

25

110.    Over the next few weeks, Altman spoke to their policyholders and hundreds of them sent letters to the Secretary of Agriculture and their Congressional representatives complaining of the hardships that reducing the commissions of Altman was having on them.

111.    No action was taken by FCIC as a result of these communications.

112.    On July 29, 2024, Altman sent a letter to the Administrator of RMA, with a cc to the Secretary of Agriculture, stating in part "In the last two years, as we informed RMA, AIPs were canceling producer policies that had losses. This created extreme instability and many producers were unable to find new AIPs before the deadline. RMA stopped AIPs from these canceling policies as a violation of the SRA. However, that has had little effect on the stability of the program. Instead of canceling the policies directly, the AIPs required agents to move poor performing policies to another AIP or risk a reduction in agent commission. AIPs have actually had their personnel come to some agents' offices and tell them the specific policies they had to move. We thought cherry picking was prohibited by the Standard Reinsurance Agreement (SRA) and state law, but no action was taken against the AIPs.

The AIPs changed their tactics and started cancelling agent/agency contracts, disrupting the crop insurance business. This was done at the end of the sales period, leaving agents scrambling to find other AIPs willing to write their policies."

113.    Altman further informed the Administrator of RMA that "To the extent that RMA believes that the issues have been resolved, they are dead wrong. We understand that the AIPs provided written assurances to RMA that "they will continue to accept new, transferred, and existing business so that no eligible producer will lose or be denied coverage" but that is a sham. The AIPs may have said the words, but their actions speak louder. The AIPs new salvo in their

26

campaign to eliminate the poor performing business from their books is to drastically reduce agent commissions on ce1iain policies, like annual forage and livestock policies, or even for causes of loss, such as prevented planting.

Even though AIPs continued to get paid by RMA on average 18-20 of the premium for the administrative and operating expenses for each policy, agent commissions have dropped from 80 percent of that 18-20 percent to as low as **1** percent of that 18-20 percent. The practical effect of this is that if an agent has $1,000,000 premium on its book of business, prior to 2022, it used to receive 80% of the A&O, or about $160,000 a year, under an even 5 percent commission rate, the agent will be paid $10,000 a year. The AIPs are pocketing the $150,000 difference to pad their already large profits."

114.    Altman stated "Specifically, section 507(c) of the FCIA states in relevant part that, "In the administration of this subtitle, the Board shall, to the maximum extent possible, ...(3) encourage the sale of Federal crop insurance through licensed private insurance agents and brokers and give the insured the right to renew such insurance for successive terms through such agents and brokers, in which case the agent or broker shall be reasonably compensated from premiums paid by the insured for such sales and renewals recognizing the function of the agent or broker to provide continuing services while the insurance is in effect:

(Emphasis added). Therefore, even though RMA has not previously been involved in the financial relationship between the agent and the AlP, it has the obligation to ensure that agents are reasonably compensated. Further, that compensation must recognize the function of the agent in continuing the service throughout the year. RMA has looked at the function of the agent and the AIPs in the sale and service of the policies when it was negotiating the 2011 SRA. RMA determined that only 20 percent of the A&O was necessary for the AIPs to perform their

27

administrative obligations such underwriting, loss adjustment, and quality control. The rest of the A&O was designated for agent commission. See section lll(a)(4) of the 2025 SRA.

AIPs cutting agent commissions by 95 percent and pocketing the difference is not reasonable compensation nor does it take into consideration the work performed by the agent in the sale and service of the policy. Cutting agent commission to the point that remaining in the program is no longer viable is not reasonable compensation nor does it take into consideration the work performed by the agent in the sale and service of the policy. Cutting agent commissions to the point that agents will be effectively working for free is not reasonable compensation nor does it take into consideration the work performed by the agent in the sale and service of the policy. Therefore, while we could argue whether the AIPs have violated the SRA, there is no argument whether the AIPs have violated the FCIA."

115.    On August 1, 2024, RMA provided a response stating: "Thank you for your July 29, 2024, letter concerning, "Crop Insurance Disruption in Texas". The Risk Management Agency (RMA) appreciates your insight and feedback on the delivery of the Federal Crop Insurance Program and will take your recommendations into consideration as part of broader program improvement efforts."

116.    On September 10, 2024, RMA provided a response to the policyholders' letters to the Secretary of Agriculture, stating: "We share your concerns with the difficult challenges Texas growers are facing. Our primary focus is always to ensure that producers have the coverage they need to help them through difficult years. In March of 2024, RMA issued Managers Bulletin, MGR-24-003, enclosed for your information, notifying all AIPs to cease and desist any cancellations of agent/agency contracts. RMA's Policyholder Bill of Rights, enclosed for your information, was also issued in response to the West Texas situation."

28

117.    The Policyholder Bill of Rights focused on the AIPs cancelling of agent contracts stating: "**Q: I had an agent for years, but I was told the AIP canceled their contract. I now have someone who lives in another part of the country servicing my policy. Do I have options?**

**A: Yes! You do not have to stay with the current AIP/agent and can transfer your policy to another AIP/agent for the next crop year.** The agent locator can be used to find another agent in your area."

118.    In addition, the Policyholder Bill of Rights stated: "**Q: My AIP canceled their contract with my agent, and I was transferred to another agent. Can I still retain my coverage levels and other options?**

**A: Generally, as long as you are an eligible producer and coverage and options remain available in your county, you should be able to retain your coverage levels and any options you selected.** You will likely need to note those choices on a new form; however, there should be no lapse in coverage if filed and serviced properly."

119.    FCIC never addressed the complained of issue of AIPs, specifically ProAg, drastically reducing agent commissions to drive them out of business.

120.    On September 16, 2024, the undersigned counsel reached out to staffers on the Senate Agricultural committee bringing the issue of huge reductions in agent compensation to their attention and AIPs cherry picking policies.  There were several meetings and communications with Senate staffers on these issues between September 18, 2024, and November 18, 2024.

121.    Staffers stated they were aware of the issue, had spoken to RMA about it, and had already addressed the issue in the proposed Senate Farm Bill.  The section-by-section of the proposed Senate Farm Bill proposal originally released in May 2024, was provided and it contained provisions providing a minimum threshold for agent commissions.

122.    On November 18, 2024, the Senate introduced the "Rural Prosperity and Food Security Act" that contained provisions in section 11302 that set the minimum agent compensation at 80 percent.  Senate staffers stated that they were separately having ongoing discussions with RMA.

123.    On February 5, 2025, the undersigned counsel, on behalf of Altman, transmitted a demand letter to RMA by email stating: "Hi Heather,

I hope you are doing well.  Attached is a request for RMA exercise its regulatory authority to stop ProAg's continuing violations of the Federal Crop Insurance Act and pay my clients reasonable compensation recognizing the function of the agent in the service of the policy throughout the year.  Over the last three years, my clients have been substantially harmed, and the harm is ongoing.  My clients are no longer seeking general relief from all the AIPs.  This request is directed specifically at the conduct of ProAg as it relates to my clients.  Let me know if you are unable to open any of the Attachments.

Please contact me at your earliest convenience and I hope we can resolve this matter in the most fair and expeditious manner."

124.    The February 5, 2025, demand letter contained the arguments why ProAg's agent commission schedules in effect for the 2022 through current crop year were in violation of

section 507(c)(3) of the Act and RMA's authority to require ProAg to remedy the violations under the Act and SRA.

125.    On February 15, 2025, RMA provided an email response stating: "Good afternoon Kim,

I'm confirming receipt of your request and will discuss it with the new administration as folks get on boarded."

126.    On February 27, 2025, the undersigned counsel, on behalf of Altman, had a phone conference with RMA.  RMA reiterated it could not do anything until the new Administrator was appointed.

127.    After the call, the undersigned counsel emailed RMA stating: "Thanks for meeting with me today.  I wondered whether the administration would be willing to send a bulletin to the AIPs that simply quotes section 507(c)(3) and remind them of their obligations to be in compliance with the law.  It would not be any accusations or position.  It would simply be a recitation of the law.  Would that be possible?"

128.    No actions were taken by FCIC as a result of these communications and no action has been taken by FCIC to resolve this matter.

129.    For the 2022 through 2024 crop years, AIPs have received underwriting gains.  In 2024, that underwriting gain was $2,340,829,067; for 2023 that underwriting gain was $1,964,803,846, for 2022 that underwriting gain was $1,303,415,226.

130.    This underwriting gain is in addition to the A&O paid to the AIPs, which is $2.2 billion in 2022.  This was approximately the amount paid in 2023 and 2024.

131.    As of 2023, ProAg had a 5.2 percent of the market share based on premium volume in the Federal crop insurance program.  Assuming the underwriting gains are distributed relatively proportionally, ProAg's 2024 underwriting gain would be approximately $121,723,111, for 2023 that underwriting gain was $102,169,799, for 2022 that underwriting gain was $67,777,591.

132.    Assuming the 5.2 percent market share, ProAg would have been paid $114,400,000 in A&O to deliver the program in 2022.  This would be the approximate amount paid in 2023 and 2024.

## FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF

133.    Altman repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

134.    Article IX of the Crop Insurance Agency Agreement, signed on June 21, 2017, between ProAg and Altman states that "This Agreement or any provision herein may be amended, modified, or waived only in writing signed by the Company and the Agent."

135.    Article IV of the Crop Insurance Agency Agreement states: "The Company shall compensate the Agent as specified in the Agent Commission Addendum, Crop Hail and Named Peril Commission Addendum, and/or other applicable addendum executed by the Company and Agent for all Policies which result in fully and timely collected premiums."

136.    The November 16, 2023, Multiple Peril Commission Schedule, effective for the 2024 and succeeding years, was not signed by the agent, Altman.

137.    The November 16, 2023, Multiple Peril Commission Schedule, effective for the 2024 and succeeding years, modified the terms of the June 17, 2017, Crop Insurance Agency Agreement by overriding the Multiple Peril Commission Schedule dated December 9, 2021, without the consent or signature of Altman.

138.    Accordingly, Altman is entitled to a declaration that the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year is invalid because it modifies the Crop Insurance Agency Agreement with ProAg dated June 21, 2017, without the mutual written consent of both parties, as required by the ProAg/Altman Crop Insurance Agency Agreement.

139.    Accordingly, Altman is entitled to a declaration that, since the Multiple Peril Commission Schedule signed by ProAg on November 16, 2023, is invalid, the ProAg/Altman Crop Insurance Agency Agreement reverts back to the Multiple Peril Commission Schedule signed by Altman on December 9, 2021, for the 2022 through current crop year.

**SECOND CAUSE OF ACTION FOR DELARATORY RELIEF**

140.    Altman repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

141.    RMA is a regulator of the Federal crop insurance program.

142.    Sections 507(c)(2) and 515 of the Act create an affirmative duty of FCIC to ensure that all program participants, including AIP, are in conformance of the Act and take such actions as are necessary to improve the compliance with the Act, including working actively with AIPs to address compliance and integrity issues as they develop.

33

143.    Under section I of the SRA, the SRA expressly incorporates the Act and FCIC's regulations published at 7 C.F.R. chapter IV.

144.    In the preamble and section II(a)(1) of the SRA, it states that FCIC will only provide subsidy and reinsurance on "eligible crop insurance contracts" sold by the AIP.

145.    Under section I of the SRA, to qualify as an "eligible crop insurance contract" the policy must be sold and serviced in accordance with the Act and FCIC's regulations.

146.    Section IV(h)(1) of the SRA states that the AIP shall comply with the provisions of the SRA, which includes the Act.

147.    The Act and the SRA both require compliance with their terms.

148.    Section 515 of the Act requires FCIC to work with the AIPs to address noncompliance issues as they develop.

149.    The SRA contains numerous remedies available to FCIC to ensure that AIPs are in compliance with the Act and SRA.

150.    One remedy under section II of the SRA is to treat all policies that are not sold in conformance with the Act as not "eligible crop insurance contracts" which mean they are not eligible for reinsurance or subsidy.

151.    Another remedy under section IV(h)(4) of the SRA states that if FCIC finds an AIP has not complied with the Act or SRA, and the AIPs has not taken the appropriate corrective action, FCIC may, at its sole discretion, require that the AIP take corrective action within 45 days of the date of making a written demand.

34

152.    Another remedy available to FCIC is found in section IV(h)(6) of the SRA and states: "In addition to any other remedies in this Agreement, if FCIC determines that the Company or its affiliate willfully violated the Agreement or FCIC procedures, FCIC reserves the right to deny reinsurance, A&O subsidy, CAT LAE, and risk subsidy for any insurance contract that is sold or serviced in violation of the terms of this Agreement or FCIC procedures."

153.    Accordingly, Altman is entitled to a declaration that FCIC has an affirmative duty to ensure that AIPs, including ProAg, are, at all times, acting in conformation of the Act and SRA.

154.    Accordingly, Altman is entitled to a declaration that when there is a violation of the Act, FCIC's regulations or SRA, FCIC has an affirmative duty to ensure that the AIPs, including ProAg, take such actions as are necessary to be in compliance with the Act, FCIC's regulations or SRA.

155.    Accordingly, Altman is entitled to a declaration that if any AIP, including ProAg, continues to fail to comply with the Act or SRA, FCIC must take such actions as are necessary to force compliance.

**THIRD CAUSE OF ACTION FOR DECLARATORY RELIEF**

156.    Altman repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

157.    Section 508(b)(7) of the Act states "The Corporation may limit catastrophic risk coverage in any county or area, or on any farm, on the basis of the insurance risk concerned."

158.    Section 508(c)(9) of the Act states "The Board may limit the availability of additional coverage under this subsection in any county or area, or on any farm, on the basis of the insurance risk involved."

159.    FCIC's regulations published at 7 C.F.R. § 457.8(b) states "FCIC or the reinsured company may reject or discontinue the acceptance of applications in any county or of any individual application upon FCIC's determination that the insurance risk is excessive."

160.    Only FCIC and the FCIC Board are authorized to determine when the insurance risk is excessive.  AIPs are not authorized to make these determinations.

161.    Neither FCIC nor the Board has limited the availability of insurance in a county, area, or farm in Texas or determined the risk is excessive except for acreage designated as uninsurable in the actuarial documents.

162.    The SRA also states in section II(a)(3) that "Except as specified below, the Company shall offer and market all plans of insurance for all crops in any State where actuarial documents are available in which it writes an eligible crop insurance contract and shall accept and approve applications from all eligible producers. The Company may not cancel an eligible crop insurance contract held by a policyholder so long as the policyholder remains an eligible producer and the Company continues to write eligible crop insurance contracts within the State, except as authorized by FCIC."

163.    This provision was included in the SRA for the express purpose of requiring all AIPs to accept any policyholder wishing to be insured by the AIP to ensure that no farmer was left without insurance and to spread the risk out among all the AIPs creating more stability in the program.

164.    This means that under the Act, FCIC's regulations, and SRA, AIPs in Texas are precluded from refusing to insure a farmer that is eligible for insurance and cannot selectively choose which farmers to ensure.

165.    Notwithstanding these provisions of the Act, regulation, and SRA requiring that AIPs, including Altman, accept and approve all applications and not cancel and continue to write all policies from farmers that apply unless they are ineligible, ProAg has entered the agent's offices, including Altman, and demanded that they move specific policies to another AIP based on the loss ratio as a show of good faith that they are trying to manage the loss ratio of their book of business.  In some cases, ProAg looked at the loss ratio of every policy to make this determination.

166.    Forcing agents to move policies to another AIP requires the agent to cancel the ProAg policy and write it for the other AIP.

167.    ProAg is effectively cancelling policies of eligible policyholders of agents, including Altman, in direct violation of section II(a)(3) of the SRA.

168.    ProAg has also refused to accept new policies from certain agents, including Altman, in direct violation of section II(a)(3) of the SRA.

169.    Accordingly, Altman is entitled to a declaration that ProAg is in violation of section II(a)(3) of the SRA by refusing to accept new policies and cherry picking the best policies, effectively cancelling the policyholders' policies.

**FOURTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

170.    Altman repeats, reiterates and realleges each and every allegation of the

37

preceding paragraphs as if set forth herein, verbatim and fully at length.

171.    FCIC has violated its obligations as program regulator under the Act and SRA to ensure that ProAg has acted in conformance with the Act, SRA, and FCIC's regulations.

172.    FCIC was made aware of ProAg's cherry picking existing policies and refusing to accept new applications since 2023.

173.    FCIC has only revised the policy to preclude cancellation of the policy by AIPs and issued a series of Manager's Bulletins that were later rescinded based on the AIPs' assurances that they will write all policies.

174.    FCIC did nothing about ProAg requiring agents to move policies they do not want to write to another AIP, what resulted in the cancellation of the policies in direct contradiction to the AIPs' assurances.

175.    FCIC were informed by policyholders and agents that agents are scrambling to find new AIPs for the policies ProAg required to be moved and that AIPs are not willing to accept new business.

176.    FCIC knew NAU Country Insurance Company was the only AIP willing to accept the policies Altman was forced to move.  FCIC also knew that NAU Country Insurance Company could not accept all the affected policies.

177.    FCIC knows allowing one AIP to cherry pick the best policies, leaving a consolidation of the policies with a higher loss ratio with another AIP, can adversely affect the financial stability of the whole crop insurance program.

178.    FCIC knows how disruptive it can be to the program when an AIP fails or is at risk of failure because of excessive losses.  American Growers Insurance Company failed in 2002 because of losses it sustained, requiring FCIC to run-off the business and effectuate transfers of the book randomly to other AIPs.

179.    Even though it is mandated by FCIC's regulations and SRA, FCIC is doing nothing to ensure that AIPs are accepting and retaining all policies, regardless of their loss ratio.

180.    FCIC is required to take such actions as are necessary to ensure AIPs are in compliance with the Act, FCIC's regulations and SRA.

181.    FCIC has failed in its obligations to protect the crop insurance program and ensure that ProAg was in compliance with the Act, FCIC's regulations and SRA even after it was made aware of the violations.

182.    Accordingly, Altman seeks a declaration that FCIC has violated its obligation to ensure that ProAg is in compliance with the Act, FCIC's regulations, and the SRA after FCIC was informed that ProAg was cherry picking policies and refusing new business.

183.    Accordingly, Altman seeks a declaration that FCIC must take such affirmative actions, including using the remedies available under the Act and SRA, as are necessary to ensure that ProAg is not circumventing the requirement that AIPs accept applications from all eligible farmers; precluding ProAg from requiring agents to move policies to another AIP based on the loss ratio; or precluding ProAg from refusing to accept new applications.

**FIFTH CAUSE OF ACTION FOR DECLARATORY RELIEF**

184.    Altman repeats, reiterates and realleges each and every allegation of the

preceding paragraphs as if set forth herein, verbatim and fully at length.

185.    ProAg is required to be in compliance with the Act, FCIC's regulations and SRA.

186.    Article V.M. of the ProAg/Altman Crop Insurance Agency Agreement, dated June 21, 2017, also incorporates the Act, FCIC's regulations, and SRA.

187.    Since the Act, FCIC's regulations and SRA are incorporated into the ProAg/Altman Crop Insurance Agency Agreement, ProAg's own contract requires compliance with the requirements of the Act, FCIC's regulations, and SRA.

188.    ProAg violated the requirements of the Act, FCIC's regulations, and SRA in the payment of Altman's commissions from the 2024 crop year to the current crop year.

189.    The Act also contains provisions relating to agent compensation.

190.    Section 507(c)(3) of the Act states: "the agent or broker shall be reasonably compensated from premiums paid by the insured for such sales and renewals recognizing the function of the agent or broker to provide continuing services while the insurance is in effect".

191.    According to the Internal Revenue Service and other sources, "reasonable compensation" is described as "the value that would ordinarily be paid for like services by like enterprises under like circumstances" and "consistent with the normal reward for any employee for the work performed or duties that are involved" and "compensation that is based on good judgment and is therefore fair."

192.    Under these descriptions, to qualify as "reasonable compensation," the payment of agent commissions must be fair, consistent, and in an amount ordinarily paid to other agents performing the same duties.

40

193.    Under the Federal crop insurance program, all agents must perform the same tasks based on the specific crop insured and the plan of insurance purchased, as outlined in the Crop Insurance Handbook. This means that all agents whose policyholders insure cotton, wheat, soybeans, etc., perform the exact same tasks as all other agents whose policyholders insure these same crops.

194.    Similarly, agents working with policyholders who purchase revenue coverage perform the same tasks as all other agents whose policyholders purchase revenue coverage.

195.    This principle applies uniformly across all policies, plans of insurance, and endorsements, as the tasks required for each remain the same, as specified in the Crop Insurance Handbook.

196.    This means that, under section 507(c)(3) of the Act, Altman is entitled to receive the same or consistent compensation as all other agents who sell and service the same policies and plans of insurance as Altman.

197.    A vast majority of the crops produced in Texas require the exact same work by the agent as crops produced in Iowa, Illinois, or Indiana where the agent compensation is generally paid at 80 percent of the A&O.

198.    Section III(a)(4)(B) of the SRA states: "in any State in which the Company is doing business, the Company, its MGA, or any affiliate shall not pay total compensation in excess of 80 percent of the total amount of A&O subsidy and CAT LAE calculated in accordance with subsection (a)(2) excluding any amounts paid under subsection (a)(2)(I), for such State."

199.    When discussing the cap on agent compensation with Congress, FCIC stated: "A recent analysis showed that about 20 percent of A&O is needed to pay expenses related to loss

41

adjustment, information technology, employees, and other operations (excluding agent commissions), yet many companies were paying agents far above the entire A&O subsidy amount in certain parts of the country."

200. Under these provisions, FCIC effectively set the reasonable compensation for agents at 80 percent.

201. This homogeny in agent compensation is reflected in the ProAg agent commission schedules. Under the Multiple Peril Commission Schedule dated December 9, 2021, agents contracted with ProAg nationwide received 80 percent of the A&O as commission with few exceptions.

202. For the 2024 and succeeding crop years, even if proven valid, ProAg exempted Altman from the Multiple Peril Commission Schedule dated December 9, 2021, and created a commission schedule that is specific and limited to Altman.

203. Under the 2024 Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, Altman is paid only 5 percent of the A&O as commission.

204. This means that Altman was receiving 5 percent of the A&O when other agents were receiving 80 percent of the A&O to sell and service the same policies and plans of insurance as Altman.

205. Altman's commission of 5 percent of A&O is not reasonable compensation under section 507(c)(3) of the Act.

206.    Except for area plans of insurance, a majority of crops produced in Texas receive an A&O subsidy of 18.5 or 21.9 percent under section III(a)(2)(E) and (F) of the SRA, for an average of about 20 percent.

207.    To put Altan's commission into perspective, assuming the average A&O subsidy of 20 percent, if an agent was under the Multiple Peril Commission Schedule dated December 9, 2021, for the 2024 crop year and wrote $2,600,000 in premium with ProAg, the agent would be paid **$416,000** ($2,600,000x.2=$520,000 x .8).  Altman, selling and servicing the same policies and plans of insurance, would be paid **$26,000** ($2,600,000x.2=$520,000 x .05), almost 94 percent less than other agents performing the same duties and tasks ($26,000/$416,000).

208.    Under this example, ProAg would still be paid $520,000 in A&O from FCIC but after paying Atman only $26,000, ProAg would be profiting in the amount of $497,000.

209.    Not only is a commission payment of $26,000 in commission not reasonable compensation, ProAg's collecting $497,000 out of the $520,000 A&O is contrary to the provisions of the SRA.

210.    Section III(a)(2)(J) of the SRA states: "In addition to other provisions of this Agreement, the amount of A&O subsidy may be adjusted to a level that FCIC determines to be equitable if issuing or servicing eligible crop insurance contracts involves expenses that vary significantly from the basis used to determine the A&O subsidy under this section."

211.    FCIC testified that it used 80 percent of the A&O when calculating the expenses used to determine the A&O subsidy.

212.    Section III(a)(2)(J) of the SRA precludes the ability of AIPs from intentionally creating profits from the A&O by requiring reductions in A&O if expenses, such as agent commissions decline significantly.

213.    Agent commissions are supposed to be fair, the value ordinarily paid for like services by like enterprises under the crop insurance program, and consistent with the normal reward for any employee for the work performed or the duties that are involved.

214.    Paying Altman 5 percent of the A&O when ProAg is paying other agents 80 percent of the A&O for performing the same tasks is not reasonable compensation for the purposes of section 507(c)(3) of the Act.

215.    Under section 507(c)(3) of the Act, agents must also be reasonably compensated for the sale and renewal of the policies "recognizing the function of the agent or broker to provide continuing services while the insurance is in effect."

216.    Agents are required to do a vast majority of the functions to provide continuing services while the policy is in effect.

217.    In accordance with the Crop Insurance Handbook, approved and published by FCIC, agents are responsible for the sale and service of the policy throughout the crop year.

218.    In accordance with the Crop Insurance Handbook, for the initial crop year, agents meet with prospective policyholders prior to the sales closing date to help them fill out the application and explain what plans of insurance are available and assist in tailoring their policy to best meet their risk management needs, including selecting plans of insurance, options, endorsements, coverages, units, price elections, etc.

219.    In accordance with the Crop Insurance Handbook, annually, Altman is responsible for explaining to all policyholders what new plans of insurance may be available, what changes have been made to their existing policies, etc.

220.    There are new policies or plans of insurance approved every year by the Board under section 508(h) of the Act and certain terms of insurance, such as premium, are frequently revised by FCIC so agents must check annually to ensure they are up to date.

221.    Altman must explain policy provisions, procedures, and the obligations of policyholders for catastrophic risk protection plans of insurance, revenue plans of insurance, yield plans of insurance, area protection plans of insurance, and whole farm revenue plans of insurance along with options and endorsements such as Margin Protection, Enhanced Coverage Option Endorsement, Supplemental Coverage Option, Stacked Income Protection Plan, actuarial documents that contain dates, yields, premium, special provisions, etc. for every county in the country for the more than 125 crops insured, and numerous Handbooks, such as the Crop Insurance Handbook and individual crop handbooks.

222.    Altman must explain and calculate premium under the different plans of insurance, endorsements and options.

223.    Altman must collect production data from policyholders for production reports and calculate the approved yield used to establish guarantees and premiums, including explaining cups, caps, yield exclusions, yield substitutions, as applicable.

224.    Altman must collect planting information from policyholders or FSA for acreage reports, including number of acres, crops, planting dates, types, practices, etc.

225.    Altman must answer any questions or concerns of the policyholder regarding any aspect of the program.

226.    Altman receives notices of loss and transmits them to the AIP.

227.    Altman is involved in the sale and service of the policy while it is in effect from the moment a farmer walks in the door until the farmer files a notice of loss.

228.    With respect to the function of the AIP to provide continuing services while the insurance is in effect, unless there is a problem or dispute, AIPs do not meet or speak to the policyholder.

229.    AIPs formerly processed the policy information provided by the agent for each policy and transmit the information to FCIC, but in the last few years, AIPs have shifted that burden to the agents who process the information directly to FCIC.

230.    AIPs annually issue a Schedule of Insurance that is computer-generated from the information provided by the policyholder through the agent.

231.    AIPs conduct underwriting as necessary, although most crops do not require underwriting other than eligibility determinations, and crops produced in Texas do not require any more underwriting than these crops produced elsewhere in the country.

232.    AIPs also must conduct quality control and audits as required by Appendix IV of the SRA, although most of these obligations occur after the end of the insurance period.

233.    The biggest responsibility of the AIP in the continuing service of the policy is loss adjustment; however, on average only around 50 percent of all policies report losses each year.

46

234. Loss adjustment, underwriting, quality control and issuing the Schedule of Insurance are all expenses FCIC included in the 20 percent of A&O that the AIP is required to retain.

235. Even though ProAg retains at a minimum 20 percent of the A&O, which covers the costs of the functions they are required to perform in the service of the policy while it is in effect, ProAg is collecting approximately 94 percent of the A&O for its administrative costs for Altman's policies.

236. Given the amount of work done by Altman in the sale, renewal or continuing service of the policy while it is in effect, 5 percent of the A&O does not recognize the function of the agent.

237. Agent commission of 5 percent of the A&O is not reasonable compensation, and it fails to recognize the function of the agent in the continuing service of the policy while it is in effect.

238. Article IX.F., the ProAg/Altman Crop Insurance Agency Agreement states "If any provision of this Agreement shall be invalid or unenforceable to any extent, the remainder of such provision of this Agreement shall not be affected thereby and shall be enforced to the greatest extent permitted by law"

239. The Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year is invalid because it was not signed by Altman and it is violation with section 507(c)(3) of the Act, but the rest of the ProAg/Altman Crop Insurance Agency Agreement remains in effect under the terms of the prior Multiple Peril Commission Schedule, dated December 9, 2021.

240.    Accordingly, Altman is entitled to a declaration that, if not determined by the court to be void, the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year, is not reasonable compensation and fails to recognize the function of the agent in the sale, renewal or continuing service of the policy while it is in effect and, therefore, is in violation of section 507(c)(3) of the Act.

241.    Accordingly, Altman is entitled to a declaration that Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year violates the terms of the ProAg/Altman Crop Insurance Agency Agreement because it is not in compliance with section 507(c)(3) of the Act.

242.    Accordingly, Altman is entitled to a declaration that the ProAg/Altman Crop Insurance Agency Agreement would revert back to the Multiple Peril Commission Schedule dated December 9, 2021, making it also effective for the 2024 and current crop year.

243.    Accordingly, Altman is entitled to a declaration that, under section 507(c)(3) of the Act and the SRA, for all future year, AIPs, including ProAg, cannot reduce commissions below the amount that has been historically paid to agents selling and servicing the same policies and plans of insurance in other States, unless the AIPs also reduce the work the agent must perform in the sale and service of the policy while it is in effect.

### SIXTH CAUSE OF ACTION FOR DECLARATORY RELIEF

244.    Altman repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

245.    FCIC was informed as far back as July 2023 that ProAg's agent commissions were being cut so deep agents had no choice but to move the book of business.

246.    From July 2023 through June 2024, FCIC took a series of actions to prevent AIPs from cancelling policies and agent contracts but did not address the issue of steep reductions in agent commissions.

247.    In MGR-24-003, FCIC expressly required AIPs, including ProAg, to report all agents whose commissions had been reduced by location.  Presumably, ProAg complied with this requirement.

248.    To Altman's knowledge, FCIC did not do anything with that information.

249.    In August 2024, FCIC was informed several times of the issue of the huge reductions in agent commissions, FCIC was reminded of their duty to ensure compliance with the Act, including section 507(c)(3), and FCIC was provided the legal analysis in support of Altman's position regarding the violation of section 508(c)(3) of the Act.

250.    Farmers wrote letters to the Secretary of Agriculture and Congress complaining of the huge reductions in agent commissions and the adverse impact it was having on them.

251.    Senate staff were contacted and made aware of the huge reductions in agent commissions, and they proposed changes in the Farm Bill that would address the issue by requiring agents to be paid not less than 80 percent of the A&O.

252.    Senate staff also contacted RMA to try to resolve this issue.

253.    In February 2025, RMA was again reminded of its duties under the Act and SRA and RMA was expressly asked to take action under section 507(c)(3) of the Act to ensure that ProAg was in compliance with the Act in the payment of commission to Altman.

254.    At no time has FCIC ever communicated to Altman it disagreed with Altman's allegations that ProAg was in violation of section 507(c)(3) of the Act.

255.    At no time has FCIC ever communicated it found that the terms of the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, used to pay Altman, was in compliance with section 507(c)(3) of the Act.

256.    FCIC has refused to engage with Altman regarding this issue of reduced agent compensation.

257.    The Act and SRA require that FCIC take affirmative action when violations of program requirements occur.

258.    Section 515 of the Act requires that FCIC work with AIPs whenever there are issues regarding whether an AIP is in compliance with the Act as the issue develops.

259.    The issue of whether ProAg was in compliance with section 507(c)(3) of the Act has been ongoing since 2023.

260.    RMA annually collects agent compensation data in the Plan of Operation under Appendix II of the SRA.

261.    To Altman's knowledge, FCIC has not addressed the issue of the huge reductions in agent commissions with ProAg at all.

262.    To Altman's knowledge, FCIC has not taken any action against ProAg to require them to pay Altman in compliance with section 507(c)(3) of the Act.

263.    To date, Altman is still being paid a 5 percent of the A&O agent commission under the Multiple Peril Commission Schedules, dated November 18, 2023.

264.    The SRA also contains numerous remedies available to FCIC when AIPs are not in compliance with the Act, regulations, or SRA.

265.    One remedy under section II of the SRA is to treat all policies that are not sold in conformance with the Act as not "eligible crop insurance contracts" which mean they are not eligible for reinsurance or subsidy.

266.    Under this remedy, all policies written by Altman would not be eligible for reinsurance or subsidy, meaning ProAg would be solely responsible for all losses under those policies and ProAg would not receive premium subsidy or A&O for such policies.

267.    FCIC's use of this remedy would provide a strong incentive for ProAg to pay Altman in accordance with section 507(c)(3) of the Act for the 2024 and current crop years.

268.    Another remedy under section IV(h)(4) of the SRA states that if FCIC finds an AIP has not complied with the Act or SRA, and the AIPs has not taken the appropriate corrective action, FCIC may, at its sole discretion, require that the AIP take corrective action within 45 days of the date of making a written demand.

269.    This remedy authorizes FCIC to demand ProAg to pay Altman in accordance with section 507(c)(3) of the Act for the 2024 and current crop years within 45 days of the demand. To Altman's knowledge, FCIC has never issued any demand on ProAg regarding Altman's agent commissions.

270.    Another remedy available to FCIC is found in section IV(h)(6) of the SRA allows FCIC deny reinsurance, A&O subsidy, CAT LAE, and risk subsidy for any insurance contract that is sold or serviced in violation of the terms of this Agreement or FCIC procedures for any willful violations of the Act or SRA.

271.     This remedy also authorizes FCIC to deny reinsurance and all subsidies if ProAg refuses to pay Altman in accordance with section 507(c)(3) of the Act for the 2024 and current crop years once required by FCIC.

272.     To Altman's knowledge, FCIC has not used this remedy to force ProAg to pay Altman in accordance with section 507(c)(3) of the Act for the 2024 and current crop years.

273.     Under sections IV(i) and (j) of the SRA, FCIC also has the authority to suspend or terminate the SRA for cause due to a material breach or failure to perform or comply with obligations under this Agreement or due to a material failure to perform or comply with this Agreement or the FCIC procedures.

274.     ProAg failed to perform or comply with its obligations under the SRA when it compensated Altman in violation of section 507(c)(3) of the Act.

275.     FCIC has an obligation to ensure that ProAg is in compliance with the Act, FCIC regulations, and the SRA; FCIC has the remedies available to force ProAg into compliance; and FCIC failed to take any appropriate action.

276.     Accordingly, Altman is entitled to a declaration that FCIC has failed in its duty to ensure that the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, is in compliance with the requirements of section 507(c)(3) of the Act from the 2024 to the current crop year.

277.     Accordingly, Altman is entitled to a declaration that FCIC failed in its duty to require that ProAg pay Altman agent compensation in amounts that are compliant with section 507(c)(3) of the Act from 2024 to the current crop year after FCIC was made aware of the actions of ProAg that comprised the violations with section 507(c)(3) of the Act.

52

278. Accordingly, Altman is entitled to a declaration that FCIC must take all actions necessary under the Act and SRA to force ProAg to pay agent compensation in an amount of 80 percent of the A&O as stated in the Multiple Peril Commission Schedule, dated December 8, 2021, that is in effect for the 2024 and current crop year.

279. Accordingly, Altman is entitled to a declaration that FCIC must take all actions as are necessary to ensure that, for all future crop year, ProAg pays Altman agent commissions in the same amounts as other agents are paid who sell and service the same policies and plans of insurance and perform the same functions in the delivery of the policy while it is in effect.

<b>SEVENTH CAUSE OF ACTION FOR DECLARATORY RELIEF</b>

280. Altman repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

281. ProAg's Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, is void because it was not signed or approved by Altman as required by the ProAg/Altman Crop Insurance Agency Agreement and provides compensation in violation of section 507(c)(3) of the Act, so the provisions of the Multiple Peril Commission Schedule dated December 9, 2021 become effective for the 2024 and current crop ears.

282. While currently effective, there are some provisions in the Multiple Peril Commission Schedule dated December 9, 2021, that are also in violation of section 507(c)(3) of the Act.

283. Under the Multiple Peril Commission Schedule dated December 9, 2021, agents contracted with ProAg nationwide receive 80 percent of the A&O as commission for all policies and plans of insurance, with a few exceptions.

53

284.    One exception states "Commission for all Texas Crops (all commodities in the RMA Actuarials for Texas other than Annual Forage, PRF, and perennials) will be 50% of the rate in the first column. If the final Agency Loss Ratio for Texas Crops is less than or equal to 90%, base commission, adjusted by the RMA A&O Ceiling Factor, up to the rate in the last column will be payable."

285.    This means agents in Texas received 50 percent of the 80 percent of the A&O, or effectively 40 percent of the A&O, unless the loss ratio is less than .9 for the agent in Texas.

286.    A loss ratio less than or equal to .9 means that the premium earned exceeds the losses paid by 10 percent, resulting in an underwriting gain.

287.    This means that even if the agent does not have any losses, but does not have enough gain, the agent's compensation is still reduced by 50 percent.

288.    If the agent's loss ratio is .91, the agent's commission is reduced by 50 percent, allowing ProAg to retain the resulting 9 percent of underwriting gain and 50 percent of the A&O.

289.    This allows ProAg to doubly profit off these agents who have done nothing wrong.

290.    Altman policies had a loss ratio in excess of .9 so they received an agent commission of 40 percent of the A&O.

291.    Nowhere in the Act, regulations, SRA or any other procedures, are there provisions that allow AIPs to punish agents by reducing their commissions if the policies they write fail to attain an underwriting gain.

54

292.    The opposite is true.  Section III(a)(4)(C) of the SRA allows AIPs to pay additional agent compensation of up to 20 percent depending on the underwriting gains in the state.

293.    The SRA contemplates that agents will be rewarded with additional compensation of up to 100 percent of the A&O if there are sufficient underwriting gains in the state, not penalized when there is no underwriting gain.

294.    There is no financial need for AIPs to reduce agent commissions based on the loss ratio.

295.    According to FCIC testimony, the 20 percent of A&O that AIPs are required to retain under the A&O covers the cost of loss adjustment for most years.

296.    For years when losses exceed 120 percent in a state, section III(a)(2)(I) of the SRA, authorizes FCIC to pay an additional A&O subsidy amount equal to 1.15 percent times the net book premium for eligible crop insurance contracts.

297.    For the 2022 crop year, Texas' loss ratio was 2.14; for the 2023 crop year, Texas' loss ratio was 1.49; and for 2024 crop year, Texas' loss ratio was 1.15.  For the 2022 and 2023 years, ProAg should have received additional A&O for the loss adjustment expenses that would cover any additional expenses incurred.

298.    Under section 507(c)(3) of the Act, to be reasonable compensation, agent commissions must also be fair and consistent with other agents doing the same work.

299.    ProAg's 50 percent reduction in agent commission for Texas agents based on their loss ratio is not consistent with other agents doing the same work.

300. ProAg's 50 percent reduction in agent commission means that Texas agents, including Altman, are paid 50 percent less than other similarly situated agents outside of Texas who sell the same plans of insurance, policies, and endorsements and perform the same work.

301. This means Texas agents', including Altman's, compensation is not consistent with other agents performing the same work and, therefore, these reduced commissions are not reasonable compensation under section 507(c)(3) of the Act.

302. ProAg reduced the agent commission because of the loss ratio, but it did not reduce the amount of work the agent must do in the sale and service of the policy while it is in effect.

303. Agents, including Altman, must still perform all the same functions mandated by the Crop Insurance Handbook but for 50 percent of the compensation previously paid.

304. ProAg does not perform any additional functions for Altman's policies.

305. ProAg's 50 percent reduction in agent commission for Texas agents based on their loss ratio, including Altman, fails to recognize the function of the agent in the service of these policies.

306. ProAg's 50 percent reduction in agent commission for Texas agents based on their loss ratio, including Altman, is also unfair because agents have no control over the farmers they insure or the losses for the policies they write.

307. Under section II(a)(3) of the SRA, all AIPs "shall offer and market all plans of insurance for all crops in any State where actuarial documents are available in which it writes an

eligible crop insurance contract and shall accept and approve applications from all eligible producers."

308.    Under Article V of the ProAg/Altman Crop Insurance Agency Agreement, all agents in the State, including Altman, must similarly offer and market all plans of insurance for all crops where actuarial documents are available.

309.    These provisions in the SRA and ProAg's agent contract ensure all farmers have access to insurance and cannot be denied except in the case of ineligibility.

310.    Given this mandate of accepting all farmers for insurance, agents, including Altman, do not have any way to improve the loss ratio of their book of business unless they violate the provisions of the SRA and their agency contract and turn away policyholders based on their loss ratio.

311.    These policyholders whose loss ratios may be higher are the exact class of vulnerable farmers that crop insurance is intended to protect.

312.    Under Section IV(a)(1) of Appendix I of the SRA, agents, including Altman, are also expressly prohibited from having any involvement or influence in the loss adjustment process.  Agents can transmit notices of loss to the AIP, but that is it.

313.    Under the SRA, loss adjustment and the resulting loss ratios are wholly outside of the agent's control, so it is unfair to reduce their compensation by 50 percent when they have no control over the policyholders they sell to, or the losses incurred by those policyholders.

314.    ProAg's 50 percent reduction in agent commission for Texas agents based on their loss ratio, including Altman, is not reasonable compensation recognizing the function of the agent in the continuing service of the policies under section 507(c) of the Act.

315.    While the Texas exception noted in Multiple Peril Commission Schedule, dated December 9, 2021, is in violation of section 507(c) of the Act, under Article IX.F. of the Multiple Peril Commission Schedule, dated December 9, 2021, the rest of the Schedule remains in effect.

316.    The Multiple Peril Commission Schedule, dated December 9, 2021, provides agent commission of 80 percent of the A&O for all policies and plans of insurance.

317.    Accordingly, Altman is entitled to a declaration that the Texas exception in the Multiple Peril Commission Schedule dated December 9, 2021, used to compensate Altman for the 2022 and 2023 crop years, which reduces the 80 percent of the A&O subsidy commission paid to all other agents performing the same duties and tasks by 50 percent unless the loss ratio for the polices in the agent's policies written for ProAg is less than .90, does not comply with the agent compensation provisions contained in section 507(c)(3) of the Act.

318.    Accordingly, Altman is entitled to a declaration that the general terms of the Multiple Peril Commission Schedule dated December 9, 2021, which provided an agent commission of 80 percent of the A&O, were effective for the 2022 and 2023 crop years.

319.    Accordingly, Altman is entitled to a declaration that for the 2022 through current crop year, Altman is entitled to the same agent commission of 80 percent of the A&O paid under Multiple Peril Commission Schedule dated December 9, 2021, for other agents outside of Texas who sell and service the same policies and plans of insurance.

## EIGHTH CAUSE OF ACTION FOR DECLARATORY RELIEF

320.    Altman repeats, reiterates and realleges each and every allegation of the

preceding paragraphs as if set forth herein, verbatim and fully at length.

321.    In August 2024, FCIC was informed several times of the issue of the use of loss ratios as a basis for some reductions in agent commissions, FCIC was reminded of their duty to ensure compliance with the Act, including section 507(c)(3), and FCIC was provided the legal analysis in support of Altman's position regarding the violation of section 508(c)(3) of the Act.

322.    Senate staff were contacted and made aware of the use of loss ratios to drastically reduce agent commissions and they proposed changes in the Farm Bill that would address the issue by requiring agents to be paid not less than 80 percent of the A&O.

323.    Senate staff also contacted RMA to try to resolve this issue.

324.    In February 2025, RMA was again reminded of its duties under the Act and SRA and was expressly asked to take action under section 507(c)(3) of the Act to ensure ProAg was in compliance with the Act in the payment of commission to Altman.

325.    At no time has FCIC ever communicated to Altman it disagreed with Altman's allegations that ProAg was in violation of section 507(c)(3) of the Act.

326.    At no time has FCIC ever communicated it found that the terms of the Multiple Peril Commission Schedule, dated December 9, 2021, used to pay Altman was in compliance with section 507(c)(3) of the Act.

327.    FCIC has refused to engage with Altman regarding this issue of reduced agent commission based on loss ratio.

328.    The Act and SRA require FCIC to take affirmative action when violations of program requirements occur.

329.    Section 515 of the Act requires FCIC to work with AIPs whenever there are issues regarding whether an AIP is in compliance with the Act as the issue develops.

59

330.    The issue of whether the Multiple Peril Commission Schedule, dated December 9, 2021, was in compliance with section 507(c)(3) of the Act has been ongoing since 2024.

331.    To Altman's knowledge, FCIC has not addressed the issue of the of the use of loss ratio as a basis for large reductions in agent commissions with ProAg at all.

332.    To Altman's knowledge, FCIC has not taken any action against ProAg to require them to pay Altman in compliance with section 507(c)(3) of the Act.

333.    To date, Altman is still being paid an agent commission under the Multiple Peril Commission Schedules, dated November 18, 2023.

334.    The SRA also contains numerous remedies available to FCIC when AIPs are not in compliance with the Act, regulations, or SRA.

335.    One remedy under section II of the SRA is to treat all policies that are not sold in conformance with the Act as not "eligible crop insurance contracts" which mean they are not eligible for reinsurance or subsidy.

336.    Under this remedy, all policies written by Altman would not be eligible for reinsurance or subsidy, meaning ProAg would be solely responsible for all losses under those policies and ProAg would not receive premium subsidy or A&O for such policies.

337.    FCIC's use of this remedy would provide a strong incentive for ProAg to pay Altman in accordance with section 507(c)(3) of the Act for the 2022 through current crop years.

338.    Another remedy under section IV(h)(4) of the SRA states if FCIC finds an AIP has not complied with the Act or SRA, and the AIPs has not taken the appropriate corrective action, FCIC may, at its sole discretion, require the AIP take corrective action within 45 days of the date of making a written demand.

339.    This remedy authorizes FCIC to demand ProAg to pay Altman in accordance with section 507(c)(3) of the Act for the 2022 through current crop year within 45 days of the demand.

340.    To Altman's knowledge, FCIC has never issued any demand on ProAg regarding Altman's agent commissions and the reduction based on loss ratio.

341.    Another remedy available to FCIC is found in section IV(h)(6) of the SRA allows FCIC deny reinsurance, A&O subsidy, CAT LAE, and risk subsidy for any insurance contract that is sold or serviced in violation of the terms of this Agreement or FCIC procedures for any willful violations of the Act or SRA.

342.    This remedy also authorizes FCIC to deny reinsurance and all subsidies if ProAg refuses to pay Altman in accordance with section 507(c)(3) of the Act for the 2022 through current crop years once required by FCIC.

343.    To Altman's knowledge, FCIC has not used this remedy to force ProAg to pay Altman in accordance with section 507(c)(3) of the Act for the 2022 through current crop years.

344.    Under sections IV(i) and (j) of the SRA, FCIC also has the authority to suspend or terminate the SRA for cause due to a material breach or failure to perform or comply with obligations under this Agreement or due to a material failure to perform or comply with this Agreement or the FCIC procedures.

345.    ProAg has failed to perform or comply with its obligations under the SRA when it compensated Altman in violation of section 507(c)(3) of the Act.

346.    FCIC has an obligation to ensure that ProAg is in compliance with the Act, FCIC regulations, and the SRA; FCIC has the remedies available to force ProAg into compliance; and FCIC failed to take any appropriate action.

347.    Accordingly, Altman is entitled to a declaration that FCIC has failed in its duty to ensure that the Multiple Peril Commission Schedule, dated December 9, 2021, is in compliance with the requirements of section 507(c)(3) of the Act from the 2022 to the current crop year.

348.    Accordingly, Altman is entitled to a declaration that FCIC failed in its duty to require that ProAg pay Altman agent compensation in amounts that are compliant with section 507(c)(3) of the Act from 2022 to the current crop year after FCIC was made aware of the actions of ProAg that comprised the violations with section 507(c)(3) of the Act.

349.    Accordingly, Altman is entitled to a declaration that FCIC must take all actions necessary under the Act and SRA to force ProAg to pay agent compensation in an amount of 80 percent of the A&O as stated in the Multiple Peril Commission Schedule, dated December 9, 2021, that is in effect for the 2022 through current crop year.

350.    Accordingly, Altman is entitled to a declaration that FCIC must take all actions as are necessary to ensure that, for all future crop years, ProAg pays Altman agent commissions in the same amounts as other agents are paid who sell and service the same policies and plans of insurance and perform the same functions.

351.    Accordingly, Altman is entitled to a declaration that FCIC must take all actions as are necessary to ensure that, for all future crop years, ProAg does not use loss ratios as a basis for adjustment of agent commissions.

**CLAIM FOR RELIEF**

62

352.    ProAg violated the terms of the Crop Insurance Agency Agreement when it modified the terms of the Crop Insurance Agency Agreement on November 16, 2023, without the written consent of Altman, nullifying the November 16, 2023, MPCI Commission Schedule Amendment; Livestock Price Insurance Commission Schedule and Crop-Hail & Named Peril Commission Schedule The Altman Group, Inc.

353.    ProAg violated the terms section 507(c)(3) of the Act when it reduced Altman's agent commissions to 5 percent of the A&O subsidy for the 2024 and subsequent crop years.

354.    ProAg violated the terms of section 507(c)(3) of the Act when it reduced Altman's agent commission by 50 percent based on Altman's loss ratio for the 2022 and 2023 crop years.

355.    FCIC failed in its statutory and contractual obligations to ensure that ProAg compensated agents in compliance with the Act, regulations and the SRA.

356.    Altman is entitled to a declaration that FCIC shall take such action as are necessary to force ProAg pay Altman the same 80 percent of A&O agent commission paid to all other agents selling the same policies and plans of insurance under the Multiple Peril Crop Insurance Commission Schedule dated December 9, 2021 for the 2022 through the current crop year.

## PRAYER FOR RELIEF

Wherefore, Altman requests that this Court:

A.    Declare that the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year is invalid because it modifies the Crop Insurance Agency Agreement with ProAg dated June 21, 2017, without the mutual written consent of both parties, as required by the ProAg/Altman Crop Insurance Agency Agreement.

B.       Declare that, since the Multiple Peril Commission Schedule signed by ProAg on November 16, 2023, is invalid, the ProAg/Altman Crop Insurance Agency Agreement reverts back to the Multiple Peril Commission Schedule signed by Altman on December 9, 2021, for the 2022 through current crop year.

C.       Declare that FCIC has an affirmative duty to ensure that AIPs, including ProAg, are, at all times, acting in conformation of the Act and SRA.

D.       Declare that when there is a violation of the Act, FCIC's regulations or SRA, FCIC has an affirmative duty to ensure that the AIPs, including ProAg, take such actions as are necessary to be in compliance with the Act, FCIC's regulations or SRA.

E.       Declare that if any AIP, including ProAg, continues to fail to comply with the Act or SRA, FCIC must take such actions as are necessary to force compliance.

F.       Declare that FCIC has violated its obligation to ensure that ProAg is in compliance with the Act, FCIC's regulations, and the SRA after FCIC was informed that ProAg was cherry picking policies and refusing new business.

G.       Declare that FCIC must take such affirmative actions, including using the remedies available under the Act and SRA, as are necessary to ensure that ProAg is not circumventing the requirement that AIPs accept applications from all eligible farmers; precluding ProAg from requiring agents to move policies to another AIP based on the loss ratio; or refusing to accept new applications.

H.       Declare that, if not determined by the court to be void, the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, and used to compensate Altman for the 2024 through the current crop year, is not reasonable compensation and fails to recognize

64

the function of the agent in the sale, renewal or continuing service of the policy while it is in effect and, therefore, is in violation of section 507(c)(3) of the Act.

I.     Declare that, for the 2024 and current crop year, the ProAg/Altman Crop Insurance Agency Agreement would revert back to the Multiple Peril Commission Schedule dated December 9, 2021.

J.     Declare that, under section 507(c)(3) of the Act and the SRA, for all future years, AIPs, including ProAg, cannot reduce commissions below the amount that has been historically paid to agents selling and servicing the same policies and plans of insurance in other States, unless the AIPs also reduce the work the agent must perform in the sale and service of the policy while it is in effect.

K.     Declare that FCIC has failed in its duty to ensure that the Multiple Peril Commission Schedule, signed by ProAg on November 16, 2023, is in compliance with the requirements of section 507(c)(3) of the Act from the 2024 to the current crop year.

L.     Declare that FCIC failed in its duty to require that ProAg pay Altman agent compensation in amounts that are compliant with section 507(c)(3) of the Act from 2024 to the current crop year after FCIC was made aware of the actions of ProAg that comprised the violations with section 507(c)(3) of the Act.

M.     Declare that FCIC must take all actions necessary under the Act and SRA to force ProAg to pay agent compensation in an amount of 80 percent of the A&O as stated in the Multiple Peril Commission Schedule, dated December 8, 2021, that is in effect for the 2024 and current crop year.

N.     Declare that FCIC must take all actions as are necessary to ensure that, for all future crop years, ProAg pays Altman agent commissions in the same amounts as other agents

65

are paid who sell and service the same policies and plans of insurance and perform the same functions.

O.      Declare that the Texas exception in the Multiple Peril Commission Schedule dated December 9, 2021, used to compensate Altman for the 2022 and 2023 crop years, which reduces the 80 percent of the A&O subsidy commission paid to all other agents performing the same duties and tasks by 50 percent unless the loss ratio for the polices in the agent's policies written for ProAg is less than .90, does not comply with the agent compensation provisions contained in section 507(c)(3) of the Act.

P.      Declare that the general terms of the Multiple Peril Commission Schedule dated December 9, 2021, which provided an agent commission of 80 percent of the A&O, were effective for the 2022 and 2023 crop years.

Q.      Declare that for the 2022 through current crop year, Altman is entitled to the agent commission of 80 percent of the A&O paid under Multiple Peril Commission Schedule dated December 9, 2021, for other agents outside of Texas who sell and service the same policies and plans of insurance.

R.      Declare that FCIC has failed in its duty to ensure that the Multiple Peril Commission Schedule, dated December 9, 2021, is in compliance with the requirements of section 507(c)(3) of the Act from the 2022 to the current crop year.

S.      Declare that FCIC failed in its duty to require that ProAg pay Altman agent compensation in amounts that are compliant with section 507(c)(3) of the Act from 2022 to the current crop year after FCIC was made aware of the actions of ProAg that comprised the violations with section 507(c)(3) of the Act.

T.	Declare that FCIC must take all actions necessary under the Act and SRA to force ProAg to pay agent compensation in an amount of 80 percent of the A&O as stated in the Multiple Peril Commission Schedule, dated December 9, 2021 that is in effect for the 2022 through current crop year.

U.	Declare that FCIC must take all actions as are necessary to ensure that, for all future crop years, ProAg pays Altman agent commissions in the same amounts as other agents are paid who sell and service the same policies and plans of insurance and perform the same functions.

V.	Declare that FCIC must take all actions as are necessary to ensure that, for all future crop years, ProAg does not use loss ratios as a basis for adjustment of agent commissions.

W.	Declare that FCIC shall take such actions as necessary to force ProAg pay Altman the same 80 percent of A&O agent commission paid to all other agents selling the same policies and plans of insurance under the Multiple Peril Crop Insurance Commission Schedule dated December 9, 2021, for the 2022 through the current crop year.

X.	Award plaintiff its costs and reasonable attorney fees; and

Y.	 Grant all other appropriate relief.

Dated:	Respectfully submitted,

Kimberley Arrigo (DC Bar Number 983330)
Arrigo Risk Consulting PLLC
3813 Bayview Dr.
Chesapeake Beach, MD 20732
703-298-6245
*Counsel for Plaintiff Altman Insurance Group, Inc.*