**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Case No. 1:25-cv-2193 (SLS)

DEFENDANT PRODUCERS AGRICULTURE INSURANCE COMPANY'S MOTION
TO DISMISS OR IN THE ALTERNATIVE COMPEL ARBITRATION

# Exhibit C



# Crop Insurance Agency Agreement

This Crop Insurance Agency Agreement is entered into by and between the Company, as defined herein, and the Agency identified as follows:

The Altman Group, Inc

**Agency Legal Name**
The Altman Group, Inc.

**Agency DBA Name (if different from the Agency Legal Name)**
Altman Group Insurance

**Authorized Agent's Full Name**
Barry Altman

**Agency Street Address**
7021 Kewanee Ste 1-101

| City, State, Zip Code | County |
|---|---|
| Lubbock, TX 79424 | Lubbock |

## THIS AGREEMENT IS SUBJECT TO ARBITRATION.

## ARTICLE I: DEFINITIONS

A. "Act" means the Federal Crop Insurance Act, as amended. (7 U.S.C. §§ 1501, *et seq.*)

B. "Agent" means the properly trained individual identified on Page 1 and licensed by the State in which an eligible crop insurance contract is sold and serviced, and who is appointed by the Company, or its designee, to sell and service such eligible crop insurance contracts pursuant to the terms of this Agreement. Where applicable in this Agreement, "Agent" shall also include Agency

C. "Agency" means the business entity or sole proprietorship identified on Page 1 employing the Agent identified on Page 1 and authorized pursuant to this Agreement by the Company, or its designee, to sell and service eligible crop insurance contracts under the federal crop insurance program and under the Company's Crop Hail Insurance and Named Peril Insurance programs.

D. "Agreement" means this Crop Insurance Agency Agreement.

E. "Company" means any subsidiary company of Producers Ag Insurance Group, Inc. that is a party to a Standard Reinsurance Agreement or to a managing general agency contract. The term also includes Producers Agriculture Insurance Company, Producers Lloyds Insurance Company, U.S. Specialty Insurance Company, and any company authorized by a subsidiary of Producers Ag Insurance Group, Inc. to issue policies pursuant to a managing general agency contract.

F. "Crop Hail Insurance" includes crop hail policies that are privately issued by or through the Company.

G. "Documents" and "Data" have the same meaning and include all forms, reports and information, however stored and however transmitted. A document is timely submitted if it is submitted in accordance with FCIC procedures or instructions provided by the Company.

H. "Eligible crop insurance contract" or "ECIC" means an insurance contract with an eligible producer: (1) covering an agricultural commodity authorized to be insured under the Act and approved for sale by FCIC; (2) with terms and

PROAG-11771 Version 5.0 August 20, 2020    Page 1 of 14

800.366.2767 | PROAG.COM | @PROAGINS    GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

conditions in effect as of the applicable contract change date; (3) that is sold and serviced in accordance with the Act, FCIC regulations, FCIC procedures, and the SRA; and (4) that has a sales closing date within the reinsurance year. For purposes of this Agreement, Crop Hail Insurance and Named Peril Insurance are also eligible crop insurance contracts.

I.   "Eligible livestock price insurance contract" or "ELPIC" means an insurance contract with an eligible producer: (1) covering a livestock commodity authorized to be insured under the Act and approved for sale by FCIC; (2) with terms and conditions in effect as of the applicable contract change date; (3) that is sold and serviced in accordance with the Act, FCIC regulations, FCIC procedures, and the LPRA; and (4) that has a sales closing date within the reinsurance year.

J.   "Eligible producer" means a person who has an insurable interest in an agricultural commodity, has not been determined ineligible to participate in the Federal crop insurance program, and possesses a United States-issued social security number ("SSN") or employer identification number ("EIN").

K.   "FCIC" means the Federal Crop Insurance Corporation and includes the Risk Management Agency ("RMA").

L.   "License" includes resident and non-resident Agent and Agency state-issued licenses.

M.   "LPRA" means the Livestock Price Reinsurance Agreement, to which the Company is a party or for which the Company is a managing general agent, and which is the annual agreement issued by FCIC providing for the reinsurance and subsidization of eligible livestock price insurance contracts and shall include all Appendices and Mandatory Amendments to the LPRA. With respect to policies sold and serviced pursuant to this Agreement, the applicable annual LPRA shall be that whose terms apply to the Reinsurance Year for which the policy in question is sold and serviced. The then-current LPRA and historical LPRAs can be accessed at https://www.RMA.usda.gov.

N.   "MPCI" means Multiple Peril Crop Insurance and includes all policies that are authorized by the Act or reinsured or subsidized by the FCIC and subject to the SRA or LPRA.

O.   "Named Peril Insurance" includes all policies that are privately issued by or through the Company, other than MPCI and Crop Hail policies.

P.   "Personally Identifiable Information" means any information about an individual maintained by the Company and its affiliates, including but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

Q.   "Policy" or "Policies" means the applicable MPCI, Named Peril Insurance, or Crop Hail Insurance policy.

R.   "Protected Information" means any Personally Identifiable Information about a policyholder, or information about the policyholder's farming operation or insurance policy, acquired from the policyholder, USDA, the Comprehensive Information Management System, or the policyholder's previous or current approved insurance provider or agent that is protected from disclosure by the Privacy Act of 1974 (5 U.S.C. § 552a), section 502(c) of the Act (7 U.S.C. § 1502(c)), or any other applicable Federal statute. This definition includes all hard copy or electronic information.

S.   "Sanctioned person" means any person who has been debarred or suspended, or voluntarily excluded under 2 C.F.R. part 180, 7 C.F.R. § 400.456 or any successor regulation by FCIC or any other U.S. Government Agency or disqualified by FCIC under section 515(h) (7 U.S.C. § 1515(h)).

T.   "Subagent" means an agent under contract with or employed by the Agency or Agent.

U.   "Subcontract" means the written contract between an Agency or Agent and a Subagent.

V.   "SRA" means the Standard Reinsurance Agreement, to which the Company is a party or for which the Company is a managing general agent, and which is the annual agreement issued by FCIC providing for the reinsurance and subsidization of MPCI and shall include all Appendices and Mandatory Amendments to the SRA. With respect to policies sold and serviced pursuant to this Agreement, the applicable annual SRA shall be that whose terms apply to

PROAG-11771 Version 5.0 August 20, 2020

800.366.2767 | PROAG.COM | @PROAGINS        GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

the Reinsurance Year for which the policy in question is sold and serviced. The then-current SRA and historical SRAs can be accessed at https://www.RMA.usda.gov.

## ARTICLE II: AGENCY APPOINTMENT

A. The Company authorizes and appoints the Agent and Agency (hereinafter "Agent", unless otherwise specified) for the purpose of selling and servicing MPCI, Crop Hail Insurance, and Named Peril Insurance policies on behalf of the Company in states where the Company and the Agent are properly licensed and authorized to transact such business. The Agent shall comply with all procedures, policies, standards, and regulations issued by the Company or FCIC, as applicable. The Agent's authority is limited to the sale and service of the above-described policies under terms authorized by: FCIC and the Company for MPCI; and applicable state law and the Company for all other policies. The Agent is not granted any exclusive right to any territory or product offered by the Company.

B. The Company reserves the right to approve or disapprove the appointment of any Subagent. The Agent may appoint Subagents to conduct business under this Agreement, with written Company approval prior to the appointment of said Subagent. Notwithstanding the foregoing, the Company's failure to approve any Subagent in writing shall not prevent the Agent from hiring or retaining such person or entity, except to the extent that such Subagent shall not be authorized or permitted to market or sell the Company's products. Agent shall not allow any Subagent that is not approved by the Company to sell Company's products or to access any Company systems. For any Subagent approved by the Company, Agent shall have a contract that shall contain, at a minimum, terms substantially similar to the terms and conditions set forth in this Agreement. Upon written request from the Company, the Agent shall provide the Company with a copy of any and all Subagent contracts involving Subagents approved by the Company. The Agent shall ensure that any Subagent obtains and maintains all licenses, certifications, and proper training as required by FCIC and the several states, as applicable. The Agent shall hold the Company harmless for acts of the Agent's employees and Subagents.

C. The Company and the Agent expressly agree that the Agent is not an employee of the Company and shall be considered an independent contractor for the purposes of this Agreement. The Agent shall not be reimbursed for any expenses incurred under this Agreement and shall supply his or her own work place, use his or her own supplies and employees, and set his or her own work hours, all at no cost to the Company.

D. The Company shall provide the necessary materials to the Agent, such as approved applications, forms, and policies which shall be used by the Agent in the transaction of business on behalf of the Company. The Agent agrees that all materials provided by the Company for use under this Agreement shall not be altered or substituted without the consent of the Company nor shall the Company accept material from the Agent in which the form has been altered or substituted without Company consent.

## ARTICLE III: PREMIUM

A. For MPCI policies, the Company will bill policyholders directly for premiums and applicable fees. For Crop Hail Insurance and Named Peril Insurance billing procedures, refer to your Crop Hail and Named Peril Commission Addenda. The Agent shall transmit to the Company immediately upon receipt all premiums, interest, and administrative fees, if any, received by the Agent from policyholders on any Policy. For amounts received by the Agent by mail regarding MPCI policies, if such amounts are received within two weeks of the applicable termination date, the Agent must forward confirmation of the postmarked envelope of the policyholder's timely payment, and such confirmation and amounts must be forwarded by the Agent to the Company or the Company's lockbox, as directed, no later than twenty-four (24) hours after the Agent's receipt, subject to unavoidable delays caused by the impossibility of the Agent's delivery because of a weekend or holiday.

PROAG-11771 Version 5.0 August 20, 2020

800.366.2767 | PROAG.COM | @PROAGINS    GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

B.  The maximum finance charge allowed by the applicable state law or as authorized by the FCIC shall be payable on all premiums not paid within thirty (30) days of the due date on any Policy sold through the Agent or the Agent's Subagent. The Company shall offset all amounts due the Company under any Policy from the payment for any indemnity, loss, or prevent plant claim to the policyholder. This is applicable to all business written under this Agreement where allowed by law.

## ARTICLE IV: COMMISSIONS

A.  Conditioned upon Agent's proper and timely discharge of the obligations set forth herein, the Company shall compensate the Agent as specified in this Agreement, the MPCI Commission Addendum, Crop Hail and Named Peril Commission Addendum, and/or other applicable addendum executed by the Company and Agent for all Policies which result in fully and timely collected premiums. Amounts payable to Agent are subject to deductions noted in this Agreement and any addenda. This compensation shall be payment in full for all services rendered by the Agent on behalf of the Company.

B.  The Company shall not be responsible for any commission or compensation that may be owing to a Subagent or employee of the Agent.

C.  Commission amounts are determined by the commission percentage and policy type as shown on the commission addenda or other applicable addendum executed by the Company and Agent. All premiums received by the Company shall first be credited to interest, if applicable, then to fees, if applicable, and then to premium for the purpose of commission.

D.  No commission shall be accrued or paid to the Agent, with respect to MPCI policies:
    1)  For which any premium, fees, and/or interest remains unpaid after the termination date published by RMA;
    2)  That are placed on the Ineligible Tracking System (ITS);
    3)  For which a collection agency or attorney has been retained to collect the outstanding premium, fees, and/or interest;
    4)  For which an acreage report is not received in the Company's office or electronically transmitted to the Company via ProAgWorks within 30 days of the acreage reporting date ("ARD") established by RMA;
    5)  For which, where applicable, an acreage report is not signed and submitted by the insured by the ARD;
    6)  For which the Agent of Record: has not completed the required training or competency testing or submitted the Conflict of Interest form for the reinsurance year; or does not subsequently submit Controlled Business forms; or for which the Agency: has not submitted its annual Non-Disclosure Certification; or does not subsequently submit required Controlled Business certification forms; or
    7)  As otherwise specified in the MPCI or Livestock Commission Addenda, or other applicable addendum executed by the Company and Agent.
    Where applicable, the above reductions apply whether or not said premium is subsequently paid or collected.

E.  No commission will be paid on any policy where the Agent of Record is not properly licensed and appointed, where required, or the Agency is not properly licensed, where required, and appointed, where required, according to the laws of the state in which the policy is written.

F.  Commission will be reduced for any damages or deductions that FCIC charges the Company as a result of the Agent's late filing of insurance documents as outlined further herein. In addition, if the Company loses Administrative and Operating Subsidy ("A&O") or Catastrophic ("CAT") Loss Adjustment Expense ("LAE") payments from RMA as a result of your failure to provide or obtain necessary and accurate information, a reduction in your commission will equal the reduction in A&O or CAT LAE payments to the Company. Situations resulting in commission reduction may require the return of any previously paid commission payments, including, but not limited to, returned premium resulting from compliance findings.

800.366.2767 | PROAG.COM | @PROAGINS                    GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

G. Agent acknowledges and agrees that compensation paid by the Company to Agent for the direct sale and service of MPCI, whether under this Agreement or with respect to any other amount or item qualifying as "compensation" under the SRA, is subject to limitations and caps under the terms of the SRA and applicable guidelines or mandates published by FCIC. The Agent agrees that in the event that the compensation paid or owing by the Company pursuant to this Agreement, or otherwise causes, in whole or in part, the Company to exceed the applicable limitations imposed by the SRA and/or FCIC, the Company may reduce the Agent's compensation proportionally so as not to exceed applicable limits and Agent may need to repay all or part of any previously paid compensation on a pro-rata basis.

H. Any commission addendum, commission schedule, or other addendum executed by the Agent and Company is subject to the terms of this Agreement, unless specifically noted in writing signed by both parties.

## ARTICLE V: AGENT RESPONSIBILITIES

The Agent shall have the following duties and obligations under this Agreement:

A. To faithfully perform all duties required hereunder; to cooperate with the Company in all matters pertaining to the issuance and cancellation of Policies and the filing of notices of loss; and to promote the best interests of the Company. The Agent shall not take any action or engage in any conduct that: (i) violates the duties generally imposed on agents by the common law or applicable state statute; (ii) violates the duties or limitations imposed on agents by the SRA, LPRA or FCIC including but not limited to those in Appendices I and IV of the SRA and LPRA; or (iii) causes the Company to breach or violate the terms and conditions of the SRA or LPRA.

B. To solicit, receive, and transmit to the Company applications for the kinds of insurance contracts to which this Agreement applies, and only as specifically authorized from time to time by the Company.

C. To successfully complete all training programs each year, as prescribed by the Company, FCIC, or other regulatory authorities, and periodic competency testing, as applicable.

D. To follow all procedures, rules, manuals, and underwriting guidelines of the Company and FCIC, whether issued by means of directives, letters, procedural or underwriting manuals, or otherwise.

E. To maintain, at the Agent's expense, all appropriate licenses to authorize the Agent to sell eligible crop insurance contracts under this Agreement. The Agent agrees not to sell any Company products in any state or territory in which Agent or Agency does not hold required license(s) and will require any Subagents to agree to the same. The Agent shall provide documentation of said license to the Company upon request. Failure to respond to such a request will result in withheld commission payments as no commission can be paid to any unauthorized party. To be in full compliance with all state licensing requirements. To advise the Company promptly of any changes in the licensing of the Agency, Agent, or any Subagents.

F. The Agent shall maintain accurate records of business conducted under this Agreement. The Company or its representatives shall have the right, at reasonable times, to examine and audit any documents or files in the possession of the Agent referring to business conducted under this Agreement. Agent shall have a system or procedure for keeping accurate records of contacts and communications with policyholders and applicants for policies.

G. Agent shall promptly report to the Company all notices of loss received from policyholders.

H. The Agent shall only offer policies at rates and forms as prescribed by the Company and not make or offer any rebates of any kind, unless authorized under the SRA or LPRA or applicable law and disclosed to the Company. The Agent shall not alter, modify, waive, or change any of the provisions or conditions of the applicable insurance contract or rates. The Agent shall not assess service fees or any other charges for servicing MPCI, Crop Hail, or Named Peril policies that are, with respect to MPCI, not authorized by federal law and approved in writing by FCIC and the

800.366.2767  |  PROAG.COM  |  @PROAGINS                          GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

Company, or with respect to Crop Hail or Named Peril, not part of the official product filing approved by the respective department of insurance or the Company's underwriting rules and procedures and approved in writing by the Company.

I.   Agent agrees that it has an obligation to be knowledgeable of all the Company's insurance products it markets, solicits, sells, and transmits applications of to the Company.

J.   Agent shall properly explain to applicants and named insureds all terms and conditions of the policy being purchased and perform all other duties imposed on Agent in the rules manuals, directives, procedures, and guidelines of the Company and FCIC, as the same may be amended from time to time. Such duties, include but are not limited to, timely notifying Agent's insureds of: sales closing dates, policy change dates, production reporting dates, acreage reporting dates, written agreement deadlines, changes to policy provisions, mandatory paperwork, premium due dates, termination dates, and for otherwise timely informing Agent's insureds about the MPCI program, FCIC rules and regulations, and Crop Hail and Named Peril policy provisions, rules, and deadlines if Agent markets the same.

K.   Upon the change of the Agent of Record (including but not limited to: death, retirement, resignation, expired license, etc.) for any insurance policy that Agent services on behalf of the Company, the Agent shall: promptly notify the Company; provide notice of the change of the Agent of Record to the insured in a timely manner; and update any electronic records to accurately reflect the agent currently servicing the policy in accordance with FCIC and/or state rules, regulations, or procedures.

L.   Except as noted herein, the Agent shall timely print and distribute to the Company's policyholders who are its customers all: declarations/confirmations of coverage; approved schedules of insurance; and, where requested by the policyholder, policy provisions unless otherwise directed by the Company. Agent shall upload or auto-attach in the Company's processing system any document provided to a policyholder. Where the policyholder has agreed to accept electronic distribution of documents, the Agent may generate and attach the documents in the Company's processing system thereby enabling electronic distribution of the documents either by the Agent or by the Company.

M.   With respect to MPCI policies reinsured by FCIC, unless an alternate submission of policy data and information is agreed to in writing, the Agent shall successfully perform data entry of all policy data and information utilizing the Company's applicable software system (for example: ProAgWorks®, myProAg™, ProAgQuote®, ProAgMapping, ProAgReports, or as otherwise provided) provided by the Company to the Agent. Failure of Agent to comply with any of the following will result in a reduction of commission. Agent must comply with the following:

1)   All policy data must be entered in such a manner that it is fully accepted by all Company and FCIC edits. This must be completed by the dates established by the Company and/or FCIC.

2)   All documents requiring signature by the insured must be scanned and uploaded into the Company's software processing system within three weeks of signature. All scanning must be at a quality level which provides legible electronic copies of original documents.

3)   Agent is responsible, at its cost, for the printing of all documents requiring signature by the insured if an electronic means of securing such signatures that is acceptable to FCIC and the Company is not available.

4)   The MPCI Processing Services Standards and Fees which are attached to and incorporated into this Agreement.

5)   Based on the Sales Closing Date ("SCD") for the earliest crop on the Policy, if the following data elements: insured's name, SSN/EIN, commodity insured, plan of insurance, coverage level, or price election have not been first accepted by FCIC by or such data is revised after the deadlines indicated below commission will be reduced as indicated:

   i.   25 days but less than 55 days past the SCD, reduced by 1% of premium;
   ii.  55 days but less than 85 days past the SCD, reduced by 2% of premium; and
   iii. 85 days or more past the SCD, reduced by 3% of premium.

800.366.2767 | PROAG.COM | @PROAGINS          GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

Commission will not be reduced when the actions of RMA or ProAg are the causes for delay. Should the above reduction percentages or deadlines be revised in the SRA, the Company reserves the right, at its discretion, to revise the above accordingly without amendment to this Agreement.

6) Based on the Production Reporting Date (PRD) for the earliest crop on the Policy, if, where applicable, the actual production history to be used to establish insurable yields under the applicable ECIC, as specified in Appendix III to the SRA, has not been first accepted by FCIC by the deadlines indicated below, commission will be reduced as indicated:

    i. 25 days but less than 55 days past the PRD, reduced by 1% of premium;

    ii. 55 days but less than 85 days past the PRD, reduced by 2% of premium; and

    iii. 85 days or more past the PRD, reduced by 3% of premium.

Commission will not be reduced when the actions of RMA or ProAg are the causes for delay. Should the above reduction percentages or related timelines be revised in the SRA, the Company reserves the right, at its discretion, to revise the above accordingly without amendment to this Agreement.

7) The Agent cannot submit estimated data for the purpose of establishing premium, liability or indemnity or for the purpose of meeting the initial production reporting deadline. Estimated data may only be used for non-binding quoting purposes.

N. The Agent shall not broadcast, publish, or distribute any advertisement or other material referring to the Company or the Company contracts of insurance not originated by the Company without first securing written approval of the Company.

O. The Agent shall not, without the express written consent of the Company, give any written or oral statement to a policyholder's attorney except in connection with a legal action or arbitration and at which the Company's attorney is present. The Agent shall not act as a policyholder's representative in any dispute resolution proceeding involving the Company. The Agent shall promptly provide Company with a copy of: any written demand for payment from the Company; any letter or email threatening litigation or arbitration, or requesting mediation with the Company received by Agent.

P. The Agent shall not admit orally or in writing any error, confess any liability, or otherwise make any statement against the Company's interest, unless advance notice is first given to the Company or pursuant to a subpoena or order issued by a court of competent jurisdiction or an arbitrator.

Q. The Agent shall promptly report to the Company any complaint received from a policyholder or applicant for a policy involving business produced under this Agreement and provide Company with a copy of any such written complaint. Not later than 48 hours after receipt, Agent shall provide Company with a copy of any notice from a state insurance department regarding a complaint received by such department involving a policy written under this Agreement.

R. In accordance with the Consumer Telephone Protection Act, the Agent agrees to receive from the Company via fax, electronic mail, or any other medium any and all material advertising the commercial availability or quality of goods and services offered by the Company.

S. With respect to MPCI policies authorized or reinsured by FCIC:

1) This Agreement is subject to the Act, as amended, the regulations promulgated thereunder, and the SRA and LPRA, which are incorporated herein by reference and of which the Company is a party, and any and all procedures, manuals, guidelines, and policies issued or approved by FCIC or the RMA. To the extent that terms and conditions of this Agreement are inconsistent with federal law, regulations, procedures, or the SRA or LPRA, now or as they may be amended, the latter shall control.

2) In accordance with the SRA, LPRA and the rules and regulations of the applicable states that govern the eligible crop insurance contracts under this Agreement, the Company must remain in compliance with the rules and regulations of these entities. If the actions of an Agent under this Agreement result in a monetary loss or penalty

PROAG-11771 Version 5.0 August 20, 2020

800.366.2767 | PROAG.COM | @PROAGINS          GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

imposed on the Company by either the FCIC or a particular state regulatory agency, that same monetary amount will be due and payable to the Company from the Agent that caused the monetary loss. In accordance with the SRA and LPRA, the Agent acknowledges that it is an "affiliate" of the Company within the meaning of the SRA and LPRA and is subject to all terms and conditions of the SRA and LPRA that pertain to the conduct and liability of affiliates.

3) In accordance with the SRA and LPRA, Agents are required to give representatives of all U.S. Government agencies access to their offices and all records that pertain to the business conducted under the SRA and LPRA for the purpose of investigation, audit, or examination, including access to records on the operation of such affiliate. Such records must be retained until six (6) years after the annual settlement date for the applicable reinsurance year or until six (6) years after the end of the insurance period of the specific eligible crop insurance contract, whichever is later. Records regarding an unsatisfied debt of a policyholder must be retained until the debt is satisfied or is discharged through bankruptcy proceedings. The FCIC may require records to be kept longer. This requirement shall survive the termination or cancellation of this Agreement.

4) In accordance with the SRA and LPRA, Agent, Subagents of the Agent, employees of the Agent, or any relative of any such Agent, Subagent, or employee, shall not be involved in loss adjustment activities in a county or adjoining county where the Agent, Subagent, or employee performs sales functions (except receipt and transfer to the Company of a notice of loss), including the following:

   i. The supervision, control, or adjustment of a claim;
   ii. Obtaining sales or production records for the purposes of loss adjustment on behalf of the policyholder (other than simply collecting information directly from the policyholder and providing it to the Company);
   iii. A loss adjustment determination or verification required to complete a claim or the determination of verification of a cause of loss;
   iv. Verification of yields for the purpose of validating insurance coverage or the guarantee;
   v. After a notice of loss has been filed, advising or assisting the policyholder in any manner regarding the preparation of the claim and the determination of the indemnity, including but not limited to, whether the loss adjuster correctly applied loss adjustment procedures; or
   vi. Any other function reserved for loss adjusters in the procedures as promulgated from time to time by the Company and/or the FCIC.

5) In accordance with the SRA and LPRA, Agents, owners of Agencies, their employees and relatives shall not be involved in the acceptance and/or verification of underwriting data relating to eligibility and coverage for an eligible crop insurance contract written by such person.

6) In accordance with the SRA and LPRA, Agents, Subagents, Agency owners, and employees of the Agent must notify and disclose to the Company any business, financial, legal, or familial relationship with a policyholder or person with a substantial interest in the policyholder. If the Agent fails to follow the provisions of this paragraph, eligible policies sold or serviced by the person who failed to disclose their relationships with a policyholder will suffer severe sanctions and penalties as determined by the Company and/or the FCIC. Any reduction in or loss of A&O, CAT LAE, or reinsurance on an ECIC(s) or ELPIC(s) incurred by the Company as a result of such persons failing to disclose such relationships shall be passed on to the Agent.

7) In accordance with the SRA and LPRA, Agent agrees not to discriminate against any employee, applicant for employment, insured, applicant for insurance, or potential applicant for insurance because of race, color, national origin, religion, sex, age, disability, marital status, or in retaliation for exercising his or her rights under applicable federal law. Agent shall be in compliance with all applicable federal laws prohibiting discrimination.

8) In accordance with Appendices I of the SRA and LPRA, the Agent shall submit a certification, and if required, a disclosure form in accordance with 31 U.S.C. § 1352.

800.366.2767 | PROAG.COM | @PROAGINS                    GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

9) In accordance with the SRA and LPRA, the Company is required to collect and provide to FCIC all SSNs, EINs, or assigned Identification Numbers that are required to be submitted by the policyholder under ECICs and ELPICs. Neither the Company, nor any of its personnel, nor any contractor or affiliate, including the Agent, may disclose to the public any information provided by the policyholder unless such disclosure is authorized by federal law.

10) In accordance with the SRA and LPRA, Agent shall implement and maintain information controls and systems, including those pertaining to all Protected Information and records, in a manner consistent with the Federal Information Security Management Act (FISMA) (44 U.S.C. Sec. 3541), or any federal law covering federal crop insurance information. FISMA is based on an on-going, risk-based process to identify, assess, plan, and strengthen information security. The Agent shall make available audit and assessments examining its Information Technology security, both internal and external, to the Company or FCIC upon request. Agent agrees to report any unauthorized disclosure of Protected Information or Personally Identifiable Information, including but not limited to policyholder SSNs, EINs or assigned Identification Numbers, to the Company immediately upon discovery. Agent agrees to comply with all data breach and other data security policies of the Company as directed.

11) In accordance with the SRA and LPRA, Agent shall not use any Sanctioned Person in any manner involving MPCI policies. Upon discovery, Agent shall promptly report to the Company any investigation which could lead to Agent, Agency, any employee of Agent, or Subagent being sanctioned under Section 1515(h) of the Act. Upon receipt, Agent shall provide Company a copy of any letter or notice from FCIC notifying the Agent, Agency, any employee of Agent, or Subagent of potential adverse action being taken by FCIC or USDA under Section 1515(h) of the Act or other applicable federal law or regulation. Upon the imposition of any sanction, suspension, or disbarment by FCIC involving Agent, Agency, any employee of Agent, or Subagent, Agent shall promptly notify Company and provide a copy of the order imposing such sanction, suspension, or disbarment.

12) In accordance with the SRA and LPRA, Agent acknowledges that its offices are considered a "workplace" under the Company's Plan of Operations submitted to FCIC. Agent shall make a good faith effort, on a continuing basis, to maintain a drug-free workplace. Agent shall notify Company promptly after being notified or otherwise learning of the conviction of Agent or any employee of Agent or Subagent of a drug violation in the workplace. Agent shall not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in the performance of this Agreement.

13) Promptly notify the Company of any suspected misrepresentation, fraud, waste or abuse involving any of the MPCI policies written or applied for under this Agreement.

T. With respect to Crop Hail Insurance and Named Peril Insurance policies:

1) The Agent may bind the Company for issuance of Crop Hail Insurance and Named Peril Insurance policies subject to any restrictions and deadlines placed on the Agent by:  the laws of the state in which the Agent is authorized to sell insurance; this Agreement; any underwriting forms, guidelines, rates, and rules issued by the Company; or other underwriting standards of the Company.

2) The Agent agrees to transmit by mail or electronically, as directed by the Company, to the designated Company office, applications for insurance on the day the signature of the applicant and Agent are affixed to the application.

3) Promptly notify the Company of any suspected misrepresentation or fraud involving any of the policies written or applied for under this Agreement.

Compliance with the duties enumerated herein, any additional duties FCIC or the Company may impose from time to time, and any duties established by common law shall be a condition precedent to the Agent's receipt of the commission described in this Agreement.

800.366.2767  |  PROAG.COM  |  @PROAGINS                    GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

## ARTICLE VI: ERRORS AND OMISSIONS

A.  By the above appointment, the Agent has a fiduciary duty to act in the exclusive interest of the Company in the sale and service of MPCI, Crop Hail Insurance, and Named Peril Insurance policies. The Agent is responsible for the acts, omission, commissions, and return commissions of the Agent's and/or Agency's employees, in addition to those of the Agent's Subagents and their agents and employees, as fully as though said acts were performed by the Agent. The Agent further agrees and acknowledges that it shall be liable to the Company for any breaches or violations of the SRA or LPRA resulting from the acts or omissions of the Agent, its Subagents, or the employees of the Agent or Agency.

B.  The Agent shall maintain a minimum of five hundred thousand dollars ($500,000) per occurrence, five hundred thousand dollars ($500,000) aggregate in errors and omissions coverage per every five million dollars ($5,000,000) in business written under this Agreement. So as not to be misunderstood, an agent who writes $6,000,000 in business under this Agreement would need to carry coverage equal to $1,000,000 per occurrence/$1,000,000 in aggregate. The Agent shall provide proof of such coverage to the Company at the time of contracting and at each and every renewal of said coverage during the term of this Agreement, or as otherwise requested by the Company. If the Agent fails to provide such proof, the Company, at its option, may terminate this Agreement. Commission payments to the Agent shall be withheld until such proof is provided and shall not be paid with respect to any Policy for which such coverage does not exist. If at any time for any reason, it is determined that the Agent does not have errors and omissions insurance coverage, each of the shareholders, partners, members, or principals of Agency agree that they will, jointly and severally, personally indemnify and hold the Company harmless from Agent's acts of error and/or omission.

## ARTICLE VII: COMMENCEMENT AND TERMINATION

A.  This Agreement shall become effective upon the latest date of execution set forth below and shall remain in effect until terminated. Upon termination, all business produced by the Agent shall remain in full force and effect until the natural expiration or prior cancellation of such business and shall be subject to all terms and conditions of this Agreement. Termination of the Agreement will not affect the parties' respective obligations for business written and accepted prior to the termination; however, the Agent shall not be authorized to sell, service, or submit applications for eligible crop insurance policies following termination. The termination of this Agreement shall be subject to any conditions imposed upon the parties by applicable state law and, in the case of MPCI, by the Federal Crop Insurance Act and the regulations promulgated thereunder, the SRA, the LPRA, and the policies and procedures of FCIC.

B.  This Agreement shall be terminated immediately without notice to the Agent in the event that the Agent loses the Agent's license, whether through revocation, suspension, nonrenewal or otherwise, and in the event of fraud or intentional misappropriation of funds by the Agent.

C.  This Agreement shall not extend to the benefit of any successor in interest of the Agent, nor may any interest under this Agreement be assigned by the Agent without the prior written consent of the Company, but such consent shall not be unreasonably withheld.

D.  The Company or the Agent may terminate the Agreement upon five (5) days prior written notice to the other, subject to any advance notice requirements under applicable law.

## ARTICLE VIII: DISPUTES / ARBITRATION

The Company and the Agent agree that they will resolve any dispute between them arising under this Agreement by binding arbitration under the rules of the American Arbitration Association. No damages or award shall be made to the Agent in excess of any commission owed under this Agreement. With respect to disputes involving disputed issues under MPCI, the arbitrator(s) shall render a reasoned decision based on the Federal Crop Insurance Act, the FCIC's regulations,

800.366.2767  |  PROAG.COM  |  @PROAGINS                 GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

procedures, the SRA or LPRA, and MPCI policies, this Agreement (as construed under the laws of the State of Texas) and the instructions and procedures issued by the Company. With respect to disputes involving disputed issues under Crop Hail Insurance and Named Peril Insurance, the arbitrator(s) shall render a reasoned opinion based on the policy provisions, the procedures and instructions issued by the Company, this Agreement (as construed under the laws of the State of Texas), and the laws of the state in which the policy is sold. Notwithstanding any other rule or procedures, the prevailing party shall be entitled to recover from the other party its costs and reasonable attorney's fees.

## ARTICLE IX: GENERAL PROVISIONS

A.  This Agreement and the obligations contained herein shall be interpreted in accordance with the laws of the State of Texas without regard to conflicts of laws, except as otherwise provided herein.

B.  This Agreement or any provision herein may be amended, modified, or waived only in writing signed by the Company and the Agent.

C.  The failure to enforce any provision(s) of this Agreement shall not be deemed a waiver of such provision(s) or any other provision(s), nor shall any delay or omission in the enforcement of such provision(s) or in the exercise of any right, power, or privilege operate as a waiver of the right to enforce such provision(s) or act as a waiver of such right, power, or privilege.

D.  This Agreement supersedes all previous agreements between the Company and the Agent.

E.  This Agreement and any right hereunder may not be assigned without the written consent of the Company.

F.  If any provision of this Agreement shall be invalid or unenforceable to any extent, the remainder of such provision and of the other provisions of this Agreement shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

G.  Each of the parties acknowledges and hereby agrees that if it should develop that there are any mistakes in this Agreement that would cause the Agreement to be defective or less than complete, then the parties will execute any and all instruments, and do any and all things necessary to effectuate the purpose and intent of this Agreement. Furthermore, in the event that any term of this Agreement or any addendum thereto is deemed to violate federal or state law, the terms of the SRA or LPRA, or the mandates of FCIC, the parties agree to execute any and all modifications necessary to remove any such violation while also effectuating the intent and purpose of this Agreement to the extent reasonably possible.

## ARTICLE X: REQUIRED STATEMENTS AND CERTIFICATIONS

Among other requirements of the Company and/or the Risk Management Agency, the undersigned Agent agrees to complete the following on a timely basis as often as they may be required:

A.  Company's Conflict of Interest Disclosure Statement, and any supplements required.

B.  Company's Non-Disclosure Statement and Annual Certification and related requirements of Manager's Bulletin MGR-09-001 and any successor thereto.

C.  Certification of compliance with the "Controlled Business Insurance" provisions of Section 508(a)(10) of the Act and of Informational Memorandum IS-08-007 and any successor thereto. The undersigned Agent further agrees to refrain from any activity that is not in compliance with Section 508(a)(10) of the Act and to require any employee of Agent, or Subagent to refrain from any activity not in compliance thereto.

D.  Acknowledgment of and agreement to the covenant not to sue contained in the SRA.

E.  Periodic certification respecting Section 1033 of the Federal Violent Crime Control Act (18 U.S.C. §1033).

In the event that Agent's failure to timely complete and submit the documents described above results in the assessment of a monetary penalty to the Company or FCIC's denial of reinsurance under the SRA or LPRA, Agent's compensation

800.366.2767  |  PROAG.COM  |  @PROAGINS        GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

under this Agreement will be reduced by the amount of such monetary penalty or any Company loss due to the denial of reinsurance.

## ARTICLE XI: GOVERNMENTAL CONTINGENCIES

A.  In accordance with the SRA and LPRA and notwithstanding any provisions of this Agreement, the obligations of the Company are contingent upon governmental authorizations and appropriations for the federal crop insurance program. If such appropriations are insufficient and the FCIC reduces its payments to the Company on a pro rata or other basis, the Company will reduce its payments under this Agreement on the same basis. If the Act is repealed this Agreement will be terminated beginning with the effective date of such repeal. If the FCIC cancels the SRA or LPRA, this Agreement will be canceled on the same basis.

B.  Any and all provisions of this Agreement that are derivatives of the SRA or LPRA will be considered revised, without the requirement of amendment to this Agreement, as a result of any deviation from, amendment to, or annual revision of the SRA or LPRA and applicable to the reinsurance year in which such deviation, amendment, or revision is effective.

**AUTHORIZING SIGNATURES**

The Altman Group, Inc

Printed Name of Agency

Barry Altman

Printed Name of Agent authorized to execute this Agreement on behalf of Agency and individually

DocuSigned by:

*Barry Altman*                                    10/8/2020

97709740BD7040E...

Authorized Agent's Signature                     Date

Jessica Dilbeck

Printed Name of Authorized Company Representative

DocuSigned by:

*Jessica Dilbeck*                                 10/8/2020

C914695E9B25464...

Signature of Authorized Company Representative   Date

800.366.2767 | PROAG.COM | @PROAGINS                GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

# MPCI Processing Services Standards and Fees

These MPCI Processing Services Standards and Fees ("Standards") are fully part of the Agency Agreement to which they are attached. Note: All references to eligible crop insurance contracts (ECICs) herein do not include Crop Hail Insurance and Named Peril Insurance.

## Processing Services and Eligibility Requirements

1. Agency shall perform Processing Services, as defined below, for all ECICs sold and serviced by Agency pursuant to the Agency Agreement.
2. As referred to in this Addendum, "Processing Services" means the performance of all the following tasks with respect to substantially all ECICs sold and serviced pursuant to the Agency Agreement for the Reinsurance Year in question:
   a. scanning, faxing, mailing, or otherwise providing original ECIC documents or legible copies of such documents to the Company;
   b. entry of electronic data at the ECIC level (including data necessary to comply with FCIC procedures); and
   c. transmission of ECIC data to the Company in a format that is compatible with the Company's system for transmitting data to RMA.

Additionally, "Processing Services" shall include any task or activity the performance of which may be required by RMA or applicable law to allow the Company to pay the Agency for "processing" without including such payment as "compensation" for the direct sale and service of MPCI.

1. In performing Processing Services, Agency shall comply with the SRA and all applicable federal laws, rules, and regulations, including any bulletins, manuals, or other mandates regarding Agency's performance under this Agreement, specifically including, but not limited to, Bulletin No.: MGR-10-011.1 issued by RMA and any successor thereto.
2. Agency shall utilize such systems, software, and procedures as may be specified by the Company from time to time without the need to amend these Standards.
3. Processing Services must be performed by Agency in a timely and accurate manner.

## Processing Fee

1. For each Reinsurance Year for which this Agency Agreement and these Standards are in effect ("Term"), the Company will pay Agency a Processing Fee for performing the Processing Services on ECICs as set forth in these Standards. The Processing Fee shall be calculated on a state-by-state basis and will be paid separately from any other amounts paid to Agency under this Agency Agreement.
2. The Processing Fee shall equal up to 5% of the applicable A&O subsidy amount received by the Company for the ECICs for the applicable state and Term, less any amounts paid by the Company for computer hardware provided by the Company to the Agency during the Term.
3. As referred to in these Standards, A&O shall mean the A&O Subsidy and CAT LAE (as those terms are defined in the SRA) received by the Company under the SRA related to ECICs written by Agency under this Agency Agreement, excluding any snapback or other additional amount received by the Company pursuant to the terms of the SRA including, but not limited to, Sections III(a)(2)(I) and (J) of the SRA.
4. The Processing Fee will be calculated and paid within thirty (30) days after the determination of the A&O subsidy as reflected on the Annual Settlement date under the terms of the SRA for the Term in question.

## Termination

These Standards and associated fees may be terminated in writing by Agency or by the Company at least thirty (30) days in advance of the first Sales Closing Date for the subsequent Term or the fees may be terminated immediately upon the effective date of any RMA termination thereof. Termination of these Standards shall not affect the remaining portion of the Agency Agreement.

PROAG-11771 Version 5.0 August 20, 2020

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.

## Miscellaneous

1. The Processing Fee amount payable by the Company is restricted and governed by the SRA and other applicable laws, rules, and regulations, and if necessary, the amount of the Processing Fee payable under this Addendum shall be reduced by an amount required to remain or become compliant with such mandates.

2. If, after payment of any Processing Fee amount to Agency, the Company determines that it must decrease the Processing Fee to remain or become compliant with any applicable law, regulation, or the SRA, Agency shall return, within thirty (30) days of receipt of request from the Company, any overpayment received by Agency.

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT
### Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

### NONDISCRIMINATION STATEMENT

**Non-Discrimination Policy**
The US. Department of Agriculture (USDA) prohibits discrimination against its customers, employees, and applicants for employment on the bases of race, color, national origin, age, disability, sex, gender identity, religion, reprisal, and where applicable, political beliefs, marital status, familial or parental status, sexual orientation, or all or part of an individual's income is derived from any public assistance program, or protected genetic information in employment or in any program or activity conducted or funded by the Department. (Not all prohibited bases will apply to all programs and/or employment activities.)

**To File a Program Complaint**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, by fax (202) 690-7442 or email at program.intake@usda.gov.

**Persons with Disabilities**
Individuals who are deaf, hard of hearing or have speech disabilities and wish to file either an EEO or program complaint please contact USDA through the Federal Relay Service at (800) 877-8339 or (800) 845-6136 (in Spanish). Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email. If you require alternative means of communication for program information (e.g., Braille, large print, audiotape, etc.) please contact USDA's TARGET Center at (202) 720-2600 (voice and TDD).
Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

800.366.2767 | PROAG.COM | @PROAGINS

GROW WITH CONFIDENCE

ProAg is an equal opportunity provider and employer. | A member of the Tokio Marine HCC group of companies.